RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0265a.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

JUSTIN PARSONS,

       *Plaintiff-Appellant,*

    *v.*

CITY OF PONTIAC, DETECTIVE SHERRY MCKINNEY, and DETECTIVE MAURICE MARTIN, jointly and severally and in their individual capacities,

       *Defendants-Appellees.*

No. 07-2299

─────────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 04-74457—R. Steven Whalen, Magistrate Judge.

Argued: June 4, 2008

Decided and Filed: July 22, 2008

Before: MERRITT, CLAY, and GILMAN, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ARGUED:** Joel B. Sklar, LAW OFFICE, Detroit, Michigan, for Appellant. Eric S. Goldstein, BERRY, JOHNSTON, SZTYKIEL, HUNT & McCANDLESS, Troy, Michigan, for Appellee. **ON BRIEF:** Joel B. Sklar, Ben M. Gonek, LAW OFFICE, Detroit, Michigan, for Appellant. Eric S. Goldstein, BERRY, JOHNSTON, SZTYKIEL, HUNT & McCANDLESS, Troy, Michigan, for Appellee.

─────────────────

## AMENDED OPINION

─────────────────

    RONALD LEE GILMAN, Circuit Judge. Justin Parsons was arrested for the nonfatal shooting of Arthur Frantz, a firefighter with the Pontiac Fire Department. Parsons was a former firefighter who was discharged as a probationary employee of the Fire Department a month and a half before the shooting. Following his arrest, Parsons was detained for approximately two days before he was released. No charges have ever been filed against him in regard to the shooting.

    Parsons sued the City of Pontiac and a number of city police officers pursuant to 42 U.S.C. § 1983 and Michigan state law. Specifically, Parsons alleges that his constitutional rights were violated because he was arrested and detained without probable cause. The district court granted summary judgment in favor of the defendants. For the reasons set forth below, we **REVERSE** the

judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

## I. BACKGROUND

### A.    Factual background

Sometime in the early morning hours of April 7, 2004, Frantz was shot twice in the chest at Fire Station # 1 in Pontiac. At approximately 6:50 a.m., firefighter Michael Lemons arrived at the station to start his shift. Lemons was the first person to discover that Frantz had been shot. Frantz was conscious and asked Lemons to call for help. The police were called to the scene and Frantz was transported to a local hospital. A preliminary investigation into the circumstances surrounding the shooting was conducted by the responding officers, who "indicate[d] that subject knocked on the northwest door and when the fireman opened it he was shot twice in the chest."

Detectives Maurice Martin and Sherry McKinney were assigned to the investigation. The detectives went to the hospital where Frantz had been transported, but he was in the operating room when they arrived. According to a Supplemental Report prepared by Detective McKinney and dated April 7, the two detectives introduced themselves to Frantz's wife, but she was too preoccupied to speak with them. The detectives left a business card with a chaplain and Frantz's two sons so that they could be contacted.

A number of firefighters were interviewed by Detectives Francine Finnegan and Jaclyn Wilton. Among those interviewed were Lemons, who initially discovered Frantz, and Captain Steven Fritz, who was the second firefighter on the scene. Lemons told the police that Frantz had said "somebody had been beating on the back door, [I] opened it up, and he shot me." Fritz also explained that Frantz told the two firefighters "that someone was banging on the door, that he opened the door, and that somebody shot him." According to Fritz, he had asked Frantz if he knew who the shooter was, and Frantz had said "No."

Detectives Martin and McKinney later conducted an interview with Sara Ann Henig, Parsons's ex-girlfriend. At approximately 8:45 a.m. on April 7, Henig had called her friend Pamela Jean Bissett and told Bissett that she suspected that Parsons had shot Frantz. Bissett convinced Henig to call the police, and the two women went to the police station. McKinney's Supplemental Report contains the following description of the interview with Henig:

> In December of 2003 Ms. Henig said that Parsons was hired by the City of Pontiac to be a Firefighter. She said that he was very excited and pleased to have a full time position in a city like Pontiac.
>
> Ms. Henig said that it wasn't long before he started complaining about the department and that he hated the guys he worked with. She stated that he use[d] to get mad and said, "Once I get my year . . . I have a list of guys I'm gonna punch out when I get off probation."
>
> Ms. Henig told us that she knew that Justin harbored ill feelings towards the Pontiac Fire Department and the guys that he worked with. She said that when she heard about a Firefighter being shot on the news she automatically thought of Justin. Ms. Henig recalled that Justin was really depressed and upset about being terminated from the Fire Department. She stated that he called her and told her that he was on the road to the state of Florida after he was fired just to clear his head.

Henig also told the detectives about a conversation that she had had with Parsons on March 19, 2004. In a written statement, Henig said that she and Parsons were discussing "how upset

[Parsons] was about having lost his job at the fire [department]." During the conversation, Henig explained, "the subject of [Parsons's] suicide attempt came up." The written statement continues:

> I asked if he was going to try again[;] he said, "Yes, but I have a plan this time."

> I asked what he was planning on doing[;] he answered "It's not something you need to worry about but you'll hear on the news when it happens."

> I said, "You're not going to do anything stupid, are you?"

> He replied, "Like I said, you don't need to worry about it."

McKinney's Supplemental Report also contains aspects of this conversation, but makes no mention of a previous suicide attempt or the correlation between Parsons's "plan" and his suicidal thoughts. The Supplemental Report does indicate, however, that Henig told the detectives that Parsons "carried a gun on his body at all times and one in his truck for protection."

According to Henig, the last time that she and Parsons communicated was online, via instant messenger, when they discussed an upcoming motorcycle race. At approximately 10:25 a.m. on April 7, Henig called and paged Parsons in the presence of the detectives. Parsons did not return Henig's call, at which point she left the police station. The interview with Henig appears to be the first time that Parsons was implicated as a potential suspect in Frantz's shooting.

Following the interview with Henig, a number of other firefighters were questioned about Parsons. Lieutenant Harvey Holland, who was involved in Parsons's discharge, told the police that there were "numerous reasons for the termination." Upon being terminated, Parsons shook Holland's hand and said, "I'm sorry, sir." Marc Seay, the firefighters' union president, told the police that Parsons never spoke to him about the termination. Parsons's behavior was in marked contrast to another individual who was terminated around the same time, one who "came in everyday to speak with the union and was active in trying to defend himself." Seay said that the second employee's behavior was much more typical of a terminated employee. There was no indication during these interviews that Frantz was involved in firing Parsons, although Frantz's subsequent deposition in this case verified that Frantz had an intermittent supervisory role over Parsons during the latter's employment.

Firefighter Christopher Gangnier said that he had seen Parsons about two weeks earlier, and that Parsons was upset about being fired. According to Gangnier, Parsons mentioned a few people by name, but the only one that Gangnier could specifically remember was Chris Haney. "[N]o direct threats were made to these individuals," but Parsons basically "was saying that they did not treat him fairly."

The final firefighter who was interviewed before Parsons was arrested was Paul Holmes. According to his written statement, Holmes was awakened by a phone call from his wife at 8:30 a.m. on April 7, informing him about the shooting. Holmes explained that "in [his] own speculation [he] thought Justin Parsons a possible suspect due to the fact that [the shooting] happened [at] the back door near the time where shifts would be changing [and] that he was privy to that information [and] had recently been terminated by the department." He called Parsons twice, once at approximately 8:30 a.m. and again at approximately 11:16 a.m. Parsons did not answer on either occasion, and Holmes left him two messages.

While Holmes was being interviewed by the police, Parsons called back to Holmes's cell phone. Holmes asked Parsons if he had heard what had happened. Parsons said "No[,] what happened[?]" According to Holmes's written statement, he proceeded to tell Parsons that Frantz had been shot and was at the hospital. Holmes then asked Parsons to meet him at a local restaurant for

lunch. Parsons agreed, and Holmes "advised the detectives that [Parsons] would be headed to the restaurant in approx[imately] 10 min[utes]."

Police officers were dispatched to the restaurant where Parsons and Holmes were scheduled to meet. The officers located Parsons sitting in his car in the parking lot. Believing that Parsons was armed, the officers approached his car cautiously, opened the car door, and pulled Parsons out of the car and to the ground. According to one officer's report of the incident, while being patted down for weapons, "Parsons made the unsolicited statement that 'Is this . . . about Art?'" Parsons was handcuffed and transported by Detectives Martin and McKinney to the Pontiac police station, where he received a *Miranda* warning at 12:45 p.m. After an in-person consultation with Art Weiss, a family friend and attorney, Parsons declined to waive his *Miranda* rights and refused to speak with the police. He was transported to the Oakland County Jail and ultimately booked on a charge of attempted murder at 4:56 p.m.

Following Parsons's arrest, the police continued their investigation. A search warrant was executed at Parsons's place of residence at approximately 5:00 p.m. that afternoon. (The report indicates that the search took place on April 6, but that is clearly a mistake because the crime did not happen until April 7.) The search uncovered four firearms, but apparently none of the guns was ever linked to the shooting.

In addition to advising Parsons, Weiss reportedly told the police that they should speak with Kiera Evans, Parsons's then-girlfriend, about a possible alibi for Parsons. According to a Supplemental Progress Report signed by Detective Martin and dated April 7, 2004, the police were investigating a claim that Parsons and Evans were at the Auburn Hills Police Department early that morning in order for Evans to submit to a breathalyzer test. Martin and McKinney went to the Auburn Hills Police Department and spoke with Sergeant Groehn, who informed the detectives that there was video of Parsons and Evans at the police station and a report indicating that Evans took her breathalyzer test at around 5:01 a.m. on April 7. According to Groehn, Parsons and Evans had left the station by 5:20 a.m. Groehn gave the detectives a copy of the surveillance video. Records from the Auburn Hills Police Department indicate that the Pontiac detectives left around 5:25 p.m. on April 7.

Martin and McKinney then went to interview Evans. According to Martin's report, Evans and Parsons spent much of the early morning hours of April 7 driving around in Parsons's truck. The couple made a number of stops, culminating in the trip to the Auburn Hills Police Department for Evans's breathalyzer test. Following the visit to the police department, Evans and Parsons returned to Evans's apartment and went to sleep. As set forth in Evans's written statement, Parsons left her apartment at around 12:20 p.m. (presumably to meet Holmes at the restaurant where he was arrested).

The police also conducted interviews on April 7 with a female friend of Parsons, Valerie McGee, and another ex-girlfriend of Parsons, Michelle Heide. McGee told the police that Parsons had expressed frustration with the fire department. Heide said that Parsons told her that he had been suspended from the fire department; she also thought that he had been out of town for the previous three weeks.

Detective Robert Koteles interviewed Roger Blovet, a possible witness to the shooting, who described a white male that he had seen running on a street near the fire station on April 7, 2004. Blovet described the man as six feet tall, weighing 200 pounds, with semi-short black hair, and wearing tan pants and a tan coat. According to the report of Blovet's interview, he saw the man at approximately 7:30 a.m., which was almost 40 minutes after Frantz was found shot.

On the following day, April 8, Sergeant Detective P.J. Moore of the Michigan State Police was informed that Frantz had been taken off of the ventilator and was able to speak. Moore was the first law enforcement officer to speak with Frantz following the shooting, conducting an interview with him at approximately 8:00 a.m. During the interview, Frantz told Moore that he did not know who shot him. Frantz explained that, immediately prior to the shooting, "he was sitting in the kitchen at the fire hall reading the paper when somebody knocked on the window near the sink." He believed that the person knocking at the window was a firefighter, explaining to Moore that firefighters arriving early for shifts often knocked on the window to get attention. Frantz unlocked the door and started to push it open. The shooter pulled the door open as Frantz pushed it.

Frantz remembered being shot only once. According to Frantz, the shooter was wearing a gray hooded sweatshirt with the hood pulled down to obscure his face. Frantz, who is 5'6", described the shooter as taller than him, perhaps as tall as 6'0". He further described the shooter as being of medium build, weighing approximately 160-170 pounds, "not real dark skinned," and "not old." Frantz said that he had no idea who would have shot him, but he did not think it was Parsons because Parsons was not as tall as the shooter.

At approximately 8:36 a.m. on April 8, Sergeant Hernanai Cristobal of the Pontiac Police Department arrived at the hospital to interview Frantz. (His report states that the interview took place on April 9, but also that Frantz was shot on April 8, indicating that the dates are all off by one day.) Frantz provided Cristobal with essentially the same information that he had given to Detective Moore. With respect to the possibility that Parsons was the shooter, Frantz said: "I don't think it was Parsons[;] why would he want to shoot me?" Frantz also reiterated that it was usually firemen who knocked on the window if they arrived for work early and did not have a key to the door. He said that the shooting took place about 30 to 45 minutes after a fire engine had returned from a run, and that a firefighter named Chapman had talked to him in the kitchen before going to bed.

The timing of these interviews by Moore and Cristobal is important because they were the first direct interactions with Frantz. As such, they marked the first times that the police were given a description of the shooter from the victim. These interviews with Frantz on April 8 were also the first time that the police heard that the shooter had knocked on the kitchen window, a practice known to firefighters but not to the general public. This is in contrast to the earlier reports by Lemons and Fritz, the two firefighters who first discovered Frantz, both of whom told the police that Frantz had said to them that the shooter had banged on the door. Despite the police not being informed of the shooter's description and the window-knocking until the morning of April 8, McKinney's Supplement Report dated April 7 contains both of these facts in the first paragraph.

On April 8 and 9, the police continued to interview various individuals. A number of other firefighters, specifically those who were working at the time that Frantz was shot, gave the police various opinions about Parsons and his job performance. The police also visited or spoke with Evans at least two more times, apparently trying to arrange a polygraph examination that Evans had offered to take.

At 11:50 a.m. on April 9, 2004, Detective McKinney completed an "Advice on Release from Custody" form for Parsons. The form indicated that Parsons was being released "pending further investigation for attempt[ed] murder charge." Parsons was then taken in handcuffs to a nearby psychiatric facility for evaluation. He was evaluated and released from the facility at 3:30 p.m. that afternoon. The Oakland County Sheriff's Department was responsible for taking Parsons to the psychiatric facility. At the hearing on the motion for summary judgment, Parsons acknowledged that none of the defendants were involved in his transfer. Accordingly, for the purposes of Parsons's claims in the present lawsuit, he was released from custody at 11:50 a.m. on April 9, a little less than 48 hours after he his initial arrest. He was never charged with the shooting of Frantz

## B.          Procedural background

Parsons filed suit against Detective McKinney, the City of Pontiac, and unnamed Pontiac police officers in November of 2004. He alleged violations of his Fourth and Fourteenth Amendment rights, as well as violations of Michigan state law that prohibit false arrest and false imprisonment. The parties consented to having the case decided by a magistrate judge.

In April of 2006, the defendants filed a consolidated motion for summary judgment and to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Parsons responded to the motion and also moved for leave to file an amended complaint. His motion for leave to file an amended complaint was granted, resulting in Detective Martin being added as a named defendant. The district court then permitted the parties to file supplemental briefing related to the defendants' consolidated motion for summary judgment and to dismiss.

A hearing on the defendants' motion was held in August of 2007, with the district court granting summary judgment to the defendants the following month. The court concluded that the individual officers were entitled to qualified immunity, that there was no municipal liability attributable to the City of Pontiac, and that the state-law claims failed as a matter of law. According to the court, the individual officers had probable cause to arrest Parsons for the attempted murder of Frantz, so that all of Parsons's claims failed. Parsons timely appealed the district court's decision only with respect to the individual defendants.

## II.  ANALYSIS

## A.    Standard of review

We review de novo a district court's grant of summary judgment. *Int'l Union v. Cummins*, 434 F.3d 478, 483 (6th Cir. 2006). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## B.    Parsons's claims under 42 U.S.C. § 1983

Section 1983 provides a cause of action to those deprived of a constitutional right by law enforcement officers acting under the color of state law. *Gardenhire v. Schubert*, 205 F.3d 303, 310 (6th Cir. 2000). A law enforcement officer's key defense to a § 1983 action is encapsulated in the concept of qualified immunity. Analysis of the qualified-immunity defense generally proceeds under the two-step, sequential inquiry articulated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The threshold question we must address is whether, "in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right[.]" *Id.*; *see also Charvat v. E. Oh. Reg'l Wastewater Auth.*, 246 F.3d 607, 616 (6th Cir. 2001) ("First, the court must ask whether the plaintiff in the civil action has demonstrated the violation of a constitutionally protected right."). Evaluating the defense of qualified immunity on a motion for summary judgment requires that we "adopt[] . . . the plaintiff's version of the facts." *Scott v. Harris*, 127 S. Ct. 1769, 1775 (2007). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.

"On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.*; *see*

*Charvat*, 246 F.3d at 616 (explaining that the court must determine "whether the right is so 'clearly established' that a reasonable official would understand that what he is doing violates that right") (citation and internal quotation marks omitted). "This inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." *Saucier*, 533 U.S. at 201. A third consideration occasionally examined by this court to "increase the clarity" of the analysis is "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 n.2  (6th Cir. 2005) (citations omitted).

### 1.    *False arrest*

Parsons's first § 1983 claim is that the police wrongfully arrested him for the shooting of Frantz. "In order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause." *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002). "A police officer has probable cause only when he discovers *reasonably reliable information* that the suspect has committed a crime." *Gardenhire*, 205 F.3d at 318 (emphasis added). Furthermore, "in obtaining such reliable information, an officer cannot look only at the evidence of guilt while ignoring all exculpatory evidence.  Rather, the officer must consider the totality of the circumstances, recognizing both the inculpatory and exculpatory evidence, before determining if he has probable cause to make an arrest." *Id.*  This court stated in *Gardenhire* that a bare allegation of criminal wrongdoing, although possibly justifying a brief investigatory detention, was insufficient by itself to establish probable cause that the suspect had committed a crime.  *Id.* at 317.  Police officers may not "make hasty, unsubstantiated arrests with impunity," nor "simply turn a blind eye toward potentially exculpatory evidence known to them in an effort to pin a crime on someone." *Ahlers v. Schebil*, 188 F.3d 365, 371-72 (6th Cir. 1999).

As this court has previously explained, a determination of whether probable cause existed requires us to examine the totality of the circumstances, and we may "consider only the information possessed by the arresting officer at the time of the arrest." *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008).  "A finding of probable cause does not require evidence that is completely convincing or even evidence that would be admissible at trial; all that is required is that the evidence be sufficient to lead a reasonable officer to conclude that the arrestee has committed or is committing a crime." *Id.*

"In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Fridley*, 291 F.3d at 872; *see also Gardenhire*, 205 F.3d at 315 (explaining that the court "must determine whether a jury could conclude that a reasonable officer could have believed that [the arrested individual] had probably committed or [was] committing a crime").  But under § 1983, "an arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent." *Harris*, 513 F.3d at 511 (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

The first question before us, then, is whether Detectives Martin and McKinney had probable cause to arrest Parsons. This determination must be made based on the totality of the information that was known to the detectives at the time of the arrest. In determining that no reasonable juror could find that they lacked probable cause to arrest Parsons, the district court described the facts known to the detectives in two different ways. First, the district court said:

> At the time Defendant McKinney made the decision to arrest the Plaintiff, she had the following information: Sara Henig, Plaintiff's former girlfriend, called to say that when she heard about the Frantz shooting on the news, she immediately thought of Plaintiff; that Plaintiff worked at the Pontiac Fire Department, and said that he hated

the people who worked there; that Plaintiff had a "list of guys" he was going to harm (i.e., "punch out") when his probationary period ended; that Plaintiff had been fired, and was despondent; that Plaintiff expressed suicidal feelings; that Plaintiff told Henig when he did something, it would be big, and she would "hear about it on the news"; that Plaintiff carried a gun with him. McKinney also knew that Frantz had opened the door to his assailant after hearing a knock at the window, which Frantz said was the typical fireman's way of getting the attention of the persons inside. Prior to the arrest, the police also talked to Plaintiff's former co-worker Holmes, who said that Plaintiff was "the first person" to come to his mind when he learned of the shooting.

The district court later described the evidence known to the detectives as follows:

> McKinney knew that Plaintiff worked for and had been fired by the victim, that he was familiar with the fireman's protocol for gaining entry, that he harbored resentment and therefore had motive to shoot the victim, that he had made threats, that he carried a gun, and that he said Henig would hear about his plan on the news.

The descriptions above are strikingly similar to McKinney's deposition testimony (taken in June of 2006) regarding the information that she recalled knowing prior to the arrest of Parsons. McKinney said that she had

> [i]nformation that he was disgruntled, that he had just recently been fired, that he had a weapon. Legally or not, I wasn't sure at that time. That he had made some statements to Ms. Henig that when he did something, it would be big and it would be on the news. The knock at the window. The familiarity of that led me to believe that it was someone who knew how firemen maneuvered. The boldness of someone knocking, getting the attention and shooting someone right across the street from the police department at a time where there would be officers coming and leaving work, firemen coming and leaving work, and the confusion of driving the streets in Pontiac. You know, a lot of one-way streets. And people repeatedly saying, you know, he was hinkey, and if anybody did it, it would be him.

The problem with McKinney's deposition testimony and the district court's recitation of the facts purportedly known to the detectives at the time of the arrest is that the documentary evidence flatly contradicts a number of the key facts. Specifically, and most importantly, the district court relied heavily on the fact that the shooter knocked on the window to get Frantz's attention, a technique that was commonly used by firefighters but not by the general public. The first indication that Frantz responded to a knock on the window, however, came from Frantz himself during his interviews with the police on the morning of April 8, 2004. Prior to speaking directly with Frantz, the only indication of how the shooter got Frantz's attention came from firefighters Lemons and Fritz, who both reported to the police that Frantz had told them that he had heard someone banging on the door, a typical form of communication that would not lead to the conclusion that the shooter was familiar with firefighter protocol.

As noted in the discussion of the facts above, McKinney's report dated April 7, 2004 details the knocking on the window and Frantz's physical description of the shooter. But the April 7 date on this report must be either a mistake or a deliberate back-date, given that the police were unable to speak with Frantz until April 8, when they first obtained his description of the shooter and the events that led to the shooting. In fact, a news story on the website Click On Detroit, originally posted at 3:38 p.m. on April 7 (three hours after Parsons was arrested), reported that "[i]nvestigators believe that the shooting victim . . . answered a knock at the firehouse's side door Wednesday morning."

Another key piece of evidence relied upon by the district court that is not supported by the record is the context in which Parsons told Henig that he had a plan that she would hear about on the news. The conversation between Parsons and Henig, which took place on March 19, 2004 (over two weeks before the shooting), centered around Parsons's suicidal thoughts related to his discharge from the Pontiac Fire Department. Henig's handwritten statement specifically links Parsons's declaration that he had "a plan" in mind to the possibility of a future suicide attempt on his part. McKinney's incorrectly dated report from April 7 states that Parsons's comment about having a plan came in response to Henig asking him "what he planned to do with his life." There is nothing in either description of the conversation that evinces a homicidal, rather than suicidal, intention. Parsons did say that he had a list of firefighters he planned to "punch out" following his probationary period, but there is a vast difference between "punching someone out" and attempted murder.

Finally, although it is unclear exactly when the police learned that Parsons had been under some degree of supervision by Frantz during his employment with the Pontiac Fire Department, there is no evidence to suggest that at the time of Parsons's arrest the detectives had information indicating that Parsons "had been fired by" Frantz as described in the district court's opinion. In fact, Frantz's name does not appear in any of the disciplinary documents related to Parsons's employment. Lieutenant Harvey Holland, who was interviewed on April 7, told the police that he had been involved in Parsons's discharge, but gave no indication that Frantz was involved as well.

Removing the above facts from the information known to the detectives at the time that Parsons was arrested casts considerable doubt on the probable cause associated with the arrest. What remains is the following: (1) information from Parsons's ex-girlfriend that (a) she thought it might be Parsons, (b) Parsons had recently been fired from the fire department and was upset, (c) Parsons had attempted suicide in the past, and that he had a plan to try again that she would hear about "on the news," (d) Parsons had a list of guys at the fire department that he wanted to "punch out" after his probationary period ended, and (e) Parsons generally carried a gun, (2) a fellow firefighter, Paul Holmes, also initially thought of Parsons as a suspect when he first heard the news that Frantz was shot, and (3) Parsons had made no effort to contest his termination from the Pontiac Fire Department, a reaction that the union president found surprising. But there were no eyewitness reports of the shooting, no forensic evidence linking Parsons to the crime, and the police, at that time, had heard only that Frantz was responding to someone banging on the back door of the fire station.

We ultimately conclude that this evidence, when viewed in the light most favorable to Parsons, is *not* susceptible to only one reasonable determination—that the detectives had probable cause to arrest Parsons. The detectives certainly had information that was sufficient to support their questioning of Parsons as a potential suspect. But as this court has made clear, probable cause for an arrest requires "reasonably reliable information that the suspect has committed a crime." *Gardenhire*, 205 F.3d at 318. A reasonable jury could find that the information known to the detectives when they arrested Parsons falls short of this probable-cause standard.

Because the district court erred in determining, as a matter of law, that the detectives had probable cause to arrest Parsons, the next step is to determine whether the constitutional right that was violated by the detectives was clearly established, and whether the detectives' "actions were objectively unreasonable in light of that right." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 310 (6th Cir. 2005) (applying the qualified-immunity analysis to the arrest of a tenant who had been accused by his landlord of criminal trespass). The detectives argue that *Smoak v. Hall*, 460 F.3d 768 (6th Cir. 2006), illustrates "how an arrest without probable cause giving rise to a constitutional violation does not in and of itself lead to civil liability." According to their argument, *Smoak* held that there is no constitutional violation where officers are reasonably mistaken in their understanding of the relevant facts.

*Smoak*, however, is easily distinguishable from the present case. In *Smoak*, this court held that the plaintiffs' brief detention on the interstate highway as suspects in a robbery became an arrest without probable cause because of the intrusiveness of the seizure. 460 F.3d at 782. The officers were entitled to qualified immunity, however, because the court concluded that "[a]lthough the use of guns and handcuffs in the present case was unreasonably intrusive, prior decisions had not made this clear." *Id.* In other words, the plaintiffs in *Smoak* failed to demonstrate that the constitutional right that had been violated was clearly established.

In the present case, however, there is no dispute that Parsons was arrested at the time the police took him into custody at the restaurant and that an arrest without probable cause is unconstitutional. *See Radvansky*, 395 F.3d at 310 ("It is beyond doubt that in 2001 the law was clearly established that, absent probable cause to believe that an offense had been committed, was being committed, or was about to be committed, officers may not arrest an individual.") (internal quotation marks omitted). The law was therefore clearly established that arrests without probable cause violated the Constitution at the time of Parsons's arrest in 2004.

Detectives Martin and McKinney, however, are entitled to qualified immunity unless their actions "were objectively unreasonable in light of the clearly established right." *See id.* But viewing the evidence in the light most favorable to Parsons, a jury could find that their actions were not objectively reasonable. The problem is not that they ignored exculpatory evidence in arresting a suspect as in *Gardenhire*, 205 F.3d at 318 (explaining that in obtaining the reasonably reliable information to satisfy probable cause, "an officer cannot look only at the evidence of guilt while ignoring all exculpatory evidence"), but that a genuine issue of material fact exists as to whether they possessed sufficient *inculpatory* evidence to reasonably believe that Parsons shot Frantz. We therefore conclude that the decision of the district court with regard to qualified immunity for Martin and McKinney must be reversed.

### 2.      *False imprisonment*

The district court also determined that the detectives were entitled to qualified immunity with respect to Parsons's § 1983 claim arising from his two-day detention. Relying on *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991), the court concluded that Parsons had failed to rebut the presumption of reasonableness that attaches to a detention that lasts less than 48 hours where the initial arrest is supported by probable cause. But based on our determination that a genuine issue of material fact exists as to whether Parsons's initial arrest was supported by probable cause, the district court's decision must also be reversed with respect to Parsons's subsequent detention. The parties have cited no cases from this court, or any other, that deny qualified immunity because of a lack of probable cause for an arrest but grant qualified immunity for the subsequent detention, regardless of the duration of said detention.

### C.      **State-law claims**

The district court dismissed Parsons's state-law claims for false arrest and false imprisonment because those claims necessarily require a finding that the arresting officers lacked probable cause. Because the court found that the officers had probable cause to arrest Parsons, his state-law claims were dismissed. In light of our decision to reverse the district court's qualified-immunity finding, however, the dismissal of Parsons's state-law claims must also be reexamined.

The detectives now argue that even if there was no probable cause to arrest Parsons, they are still entitled to immunity from his state-law claims under Michigan's governmental-immunity statute. This argument, however, is raised for the first time on appeal, and we therefore decline to consider it. *See Berryman v. Rieger*, 150 F.3d 561, 568 (6th Cir. 1998) ("It is a well-established rule that this Court will not consider claims that are presented for the first time on appeal nor arguments

that are not properly raised below.").  We therefore reinstate Parsons's state-law claims for further consideration by the district court.

### III.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.