NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0779n.06

No. 11-3123

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Jul 18, 2012*

LEONARD GREEN, Clerk

EDWARD F. HAYS,                                        )
                                                       )
           Plaintiff-Appellant,                        )
                                                       )          ON APPEAL FROM THE
v.                                                     )          UNITED STATES DISTRICT
                                                       )          COURT FOR THE NORTHERN
AARON BOLTON; RICHARD                                  )          DISTRICT OF OHIO
GRASSING; VERMILION POLICE                             )
DEPARTMENT; ROBERT KISH;                               )
CITY OF VERMILION,                                     )
                                                       )
           Defendants-Appellees.                       )


BEFORE:  SUHRHEINRICH, MOORE and CLAY, Circuit Judges.


        **SUHRHEINRICH, Circuit Judge.**  After a jury acquitted him of domestic violence against

his daughter, Defendant-Appellant Edward Hays brought various claims against those responsible

for his arrest: the City of Vermillion, the Vermillion Police Department, Vermillion Police Chief

Robert Kish, and Vermillion Police Officers Bolton and Grassnig.  The district court found that

Officers Bolton and Grassnig were entitled to qualified immunity and dismissed each of Hays'

claims.  Hays appeals.  For the reasons stated, we **AFFIRM**.

## I.  Background

        This case arises from the arrest and subsequent prosecution of Defendant-Appellant Edward

Hays (Hays) for domestic violence against his then-eighteen year old daughter Heather.

Late on the night of December 7, 2008, Heather, angry because Hays had grounded her for lying about her whereabouts earlier that night, told her parents that she was moving out of their home. Heather admitted at trial that she had previously threatened to move out but had nonetheless continued to live with her parents. Heather packed her belongings while fighting loudly with her mother and Hays yelled at her to be quiet. When Heather did not stop screaming, Hays emerged from his bedroom and told her "if you're going to leave, you need to leave, but this fighting has to stop.

Hays put one hand on Heather's shoulder and walked with her down the stairs and out the door, locking the door behind her. Although Heather's slip-on shoes had fallen off while being led down the stairs, Hays testified that he did not know Heather was barefoot when he locked her out of the house. The temperature that night was approximately nineteen degrees with a wind chill of fourteen degrees and there was snow on the ground.

Heather's friend Brie had driven to the Hays residence and was waiting outside when Hays locked her out. Although her feet were one or two sizes smaller than Heather's, Brie gave Heather her shoes to wear. Heather then realized that she had forgotten some of her things inside the home. At 11:35 p.m., she called the Vermilion Police Department, telling them:

> I was like, dad, I need my stuff. If I don't have my stuff I'll call a police officer over here so I can get my clothes and he threw me out without any shoes on. I was barefoot and my friends came and I just need a police officer to go get my stuff.

Dispatch radioed Vermilion Police Department Officers Bolton and Grassnig to the scene for a "father daughter domestic. The daughter is 18, she's locked out of the house at this time.

Heather waited in the car with Brie until the officers arrived. When they did, she exited the car and told them that "I had all my stuff in a yellow bin and I had my shoes and everything and like I was wearing slippers. So then like he like pulled me downstairs and they fell off and like my bin is not there anymore, nothing is there. She was upset and crying. Audio from the officers' patrol cars records Heather affirming to the officers that she was forcibly removed from the home:

> Officer [Bolton]: How did you end up outside, did he grab you - -
> Officer [Grassnig]: He threw her out (inaudible).
> Officer [Bolton]: - - and you pulled you outside?
> Heather: Yes.

*Id*. at 8. The officers knocked loudly on the door, rang the doorbell, and telephoned Hays to have him come to the door. While doing so, the officers discussed the fact that Heather was a resident of the home she was trying to enter:

> Officer [Bolton]: It's her house, so, she lives here.
> Officer [Grassnig]: Yep.
> Officer [Bolton]: (Inaudible) breaking and entering, breaking into her own house.
> Officer [Grassnig]: Nope.
> Heather: I don't want to break anything.
> Officer [Grassnig]: You live here.
> Heather: I honestly don't want to cause trouble, I just want my stuff.
> Officer [Grassnig]: Well, that's what we're saying, you live here, if you want to go
> in and get your stuff.
> Heather: Can you stop banging?

*Id*. at 10-11. Officer Bolton then left to check the doors and windows around the home. He reported back that "everything is locked." *Id*. at 12. Officers Bolton and Grassnig were standing at the front door with Heather when it was discovered that the garage door had since been opened.

Heather proceeded into the house and the two officers followed. While the officers searched the first floor for residents, Heather went upstairs to gather additional belongings from her bedroom.

3

Hays then came out from his upstairs bedroom and objected to the officers' presence in his home. He asked whether they had broken in, to which Officer Grassnig responded that they had not, and Heather stated that the garage door was open. Officers Bolton and Grassnig asked Hays to come down the stairs and speak with them. Hays again questioned the officers' authority to be in his home and he did not immediately proceed down the steps toward them. The officers then arrested Hays for domestic violence

Hays proceeded to trial and was found not guilty. He then brought suit in the federal District Court for the Northern District of Ohio against the City of Vermillion, the Vermillion Police Department, Vermillion Police Department Chief Robert Kish, and Vermillion Police Officers Bolton and Grassnig (collectively, Defendants) alleging warrantless entry and arrest without probable cause in violation of the Fourth Amendment, municipal liability, false arrest, malicious prosecution, and various Ohio state law violations. After extensive discovery, the district court granted Defendants' motion for summary judgment on Hays' claims against Officers Bolton and Grassnig, finding that they were entitled to qualified immunity. The district court also granted Defendants' motion for summary judgment on Hays' remaining claims, all of which were predicated upon Officers Bolton and Grassnig's alleged wrongdoing.[1] Hays appeals.

---

[1] The district court granted Defendants' motion for summary judgment on Hays' state constitutional claims on the additional basis that Hays had neither opposed Defendants' motion nor provided any evidence to support a state constitutional violation.

No. 11-3123
*Hays v. Bolton, et al.*

## II. Analysis

### A. Standard of Review

We review the district court's grant of summary judgment *de novo*. *Knott v. Sullivan*, 418 F.3d 561, 567 (6th Cir. 2005). In doing so, we view evidence in the record and make all reasonable inferences in favor of the nonmoving party. *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576-77 (6th Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B. Qualified Immunity

The sole claim presented on appeal is whether the district court erred in granting Defendants' motion for summary judgment on Hays' claims against Officers Bolton and Grassnig, finding the officers entitled to the protection of qualified immunity.[2] The Supreme Court has held that the doctrine of "[q]ualified immunity balances two important interests—the need to hold public officials

___

[2] Hays' brief mentions no other claims and we thus consider them waived. *See Ahlers v. Schebil*, 188 F.3d 365, 374 (6th Cir. 1999) (claims not raised in the plaintiff's appellate brief are waived) (internal citations omitted). Even if we were to address them on their merits, however, Hays' remaining claims fail because they are predicated on the assumption, rejected *infra*, that Officers Bolton and Grassnig's conduct was unlawful.

accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). If an officer's error is entitled to the protection of qualified immunity, such protection "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (internal quotation marks and citations omitted).

Whether officers are entitled to qualified immunity for their actions is a question of law we review *de novo. Phillips v. Roane Cnty.*, *Tenn.*, 534 F.3d 531, 538 (6th Cir. 2008). Generally, the first step in identifying its applicability is to determine whether "in the light most favorable to the party asserting the injury, . . . the facts alleged show the [officers'] conduct violated a constitutional right[.]" *Parsons v. City of Pontiac*, 533 F.3d 492, 500 (6th Cir. 2008) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001) *receded from by Pearson v. Callahan*, 555 U.S. 223 (2009)). If a constitutional right has been violated, we must then ask "whether the right was clearly established." *Id.* (citing *Saucier*, 533 U.S. at 201). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. If necessary, we may clarify the analysis by also asking "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Parsons*, 533 F.3d at 500 (citing *In re Carter v. City of Detroit*, 408 F.3d 305, 311 n.2 (6th Cir. 2005). In *Pearson*, the Supreme Court reconsidered the two-step process in *Saucier* and held that "while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory."

6

*Pearson*, 555 U.S. at 236 (affirming, however, that the *Saucier* sequence may be preferred because "it often may be difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be.") (quoting *Lyons v. Xenia*, 417 F.3d 565, 581 (6th Cir. 2005) (Sutton, J., concurring)). Post-*Pearson*, we have held that although our Court "still [is] required to address the same questions in conducting our qualified immunity analysis, . . . we are free to consider those questions in whatever order is appropriate in light of the issues before us." *Moldowan v. City of Warren*, 573 F.3d 309, 333 (6th Cir. 2009).

Hays claims the district court erred in finding Officers Bolton and Grassnig entitled to qualified immunity because they violated his Fourth Amendment right against unreasonable search and seizure when they conducted a non-consensual search of his home and arrested him without probable cause. As explained more fully below, we find that the officers' conduct was reasonable and affirm the district court's dismissal of Hays' Fourth Amendment claims.

### 1. Officers Bolton and Grassnig entered the Hays residence with Heather's apparent consent

Generally, the Fourth Amendment protects individuals from warrantless searches of their homes and possessions. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). The Fourth Amendment's protection does not apply. If consent is given by one who has actual or apparent authority over the item or place to be searched. *United States v. Caldwell*, 518 F.3d 426, 429 (6th Cir. 2008). "When one person consents to a search of property owned by another, the consent is valid if 'the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the

consenting party had authority over the premises.'" *United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996) (quoting *Rodriguez*, 497 U.S. at 188).

We find that there is ample evidence to support the district court's conclusion that Heather had apparent authority to consent to a warrantless entry into the Hays residence. At approximately 11:35 p.m. on a below-freezing night in the middle of the winter, Heather called 911 representing that Hays had "thr[own] [her] out without any shoes on." She called with the express request that a police officer be dispatched to the scene to "go get [her] stuff." *Id*. When Officers Bolton and Grassnig arrived, Heather maintained that her father had "pulled [her] downstairs" and that she ended up outside because Hays had "grab[bed]" her, "threw," and "pulled" her out. Though given multiple opportunities to do so, Heather never indicated that she had ostensibly "moved out" of the Hays residence.

Heather stood by without objection while Officers Bolton and Grassnig, who had been sent to the Hays residence pursuant to Heather's request, attempted to gain entry into the home. She did not correct the officers when they twice-mentioned that she lived at the residence. Although she asked the officers to "stop banging" on the door, she did not tell them she no longer wanted to get into the house. *Id*. at 11. Indeed, when the garage door was discovered to be partially open, Heather led them inside. As the district court recognized, Heather had no problem with the officers following her in (in fact, she testified she believed they would do so) and only became "upset" when "they started arresting [her] father."

We have held that "magic words" are not necessary for effective consent; rather, the totality of the circumstances, including a party's non-verbal conduct, should be considered in determining

whether consent exists. *See United States v. Carter*, 378 F.3d 584, 588 (6th Cir. 2004) (finding

consent "considering th[e] testimony and all [of] the circumstances" where an ordinary citizen would

have recognized that assent had been given). Here, the totality of the circumstances suggested that

Heather was a forcibly removed co-tenant with authority to consent to a warrantless search of the

residence. Even assuming Heather was no longer a resident and lacked the actual authority to

consent to a search, we conclude that she displayed apparent authority sufficient to justify Officers

Bolton and Grassnig's conduct under the Fourth Amendment.[3]

### a. Hays' objection to the officers' presence did not withdraw Heather's consent under clearly established law

Hays argues that even assuming Heather had apparent authority to give the officers consent

to enter the Hays residence, his objection to their presence withdrew Heather's consent and

invalidated his subsequent arrest. His argument rests upon a seminal Supreme Court case—*Georgia*

---

[3] Following Defendants' motion for summary judgment in this case, Heather submitted a sworn affidavit in which she claimed she did not consent to Officers Bolton and Grassnig entering the Hays residence and she did not tell the officers that her father had dragged her down the steps. The district court struck the affidavit because it materially contradicted Heather's deposition testimony, relying on *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986) (holding that a party cannot create a genuine issue of material fact by filing a post-motion for summary judgment affidavit that materially contradicts his or her prior testimony). Hays argues that *Reid*'s holding is inapplicable because it regarded the affidavit of a *party himself* and not a mere testifying witness. Whether *Reid* is in fact so limiting is a matter we need not decide, for even if we were to consider Heather's statement, it does not create a genuine issue of material fact to overcome summary judgment. While Heather claims she gave no consent to enter the Hays residence, for example, she does not contest her statements to the 911 dispatcher or her non-verbal conduct that formed the basis for the district court's ruling that she had provided apparent consent. Moreover, even if Heather never told the officers her father *dragged* her outside—as she claims in the affidavit—the officers still had probable cause to arrest Hays based, *inter alia*, on the freezing temperatures outside and Heather's insistence that she had been *thrown* out of the house.

*v. Randolph*, 547 U.S. 103 (2006)—and an unpublished decision by this Court—*United States v. Tatman*, 397 F. App'x 152 (6th Cir. 2010)—interpreting it.

Neither *Randolf* nor *Tatman* espouses a principle that would strip Officers Bolton and Grassnig from governmental immunity in this case. In *Randolf*, the Supreme Court held that a co-tenant who is physically present and objects to a police officer's entry prevails over a co-tenant who grants permission for a search. *Randolph*, 547 U.S. at 106. The decision specifically cabins an objecting co-tenant's power, however, giving him effect only when he voiced his objection as part of the initial discussion of consent to enter the premises. *Randolph*, 547 U.S. at 121 ("[When] a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out."). Thus, *Randolph* limits, clearly and succinctly, an objecting co-tenant's ability to vitiate the previously given consent of his co-tenant to situations where the objecting co-tenant voices his complaint before the search or entry has taken place. *Id*. The Supreme Court itself noted that so long as no foul play was involved in "remov[ing] the potentially objecting tenant from the entrance for the sake of avoiding a possible objection," there is practical value to its bright-line distinction "recognizing the co-tenant's permission when there is no fellow occupant on hand" before the search commences. *Id*. The Court explained that common sense justified its formalism, noting that "it would needlessly limit the capacity of the police to respond to ostensibly legitimate opportunities in the field if we were to hold that reasonableness required the police to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received." *Id*. at 122. A simple application of this principle

shows that Officers Bolton and Grassnig were legally entitled to search the Hays residence when Heather, the only tenant with actual or apparent authority over the premises to participate in the threshold colloquy regarding entrance therein, granted them permission to do so.

Four years after *Randolph* and two years *after* the events in this case, our Court decided. In that case, Tatman's wife had apparent authority to allow officers to search her husband's home within which she no longer lived. *Tatman*, 397 F. App'x at 156. Tatman was standing upstairs when the officers crossed the threshold to his home and he immediately objected to the sheriff's presence before any search was conducted. *Id*. The sheriff nonetheless conducted a search of Tatman's residence and arrested him for domestic violence. *Id*. Considering the seemingly arbitrary nature of *Randolph*'s holding, we concluded that the Supreme Court "did not intend [its] 'at the door' language to be talismanic." *Id*. at 161. We thus held that, because Tatman was a physically present co-tenant who objected to a search the officer had not yet commenced, his objection invalidated any consent Tatman's wife had given. *Id*. at 162-63. "That he voiced this objection from the top, rather than the foot, of his staircase," we reasoned, "does not change this fact." *Id*. at 162.

Relying on *Tatman*, Hays contends that his objection to Officers Bolton and Grassnig's presence in his home withdraws any consent Heather had to allow the police entry. We reject this argument and find *Tatman* unpersuasive for at least two reasons. To begin, *Tatman* was not decided until two years *after* the events in this case. *See Tatman*, *supra*. An unpublished case not yet in existence cannot possibly supply the "clearly established" constitutional right an officer must violate to disqualify himself of governmental immunity. *See Parsons*, 533 F.3d at 500 (citing *Saucier*, 533 U.S. at 201) (holding that if an officer's conduct is found to have violated a constitutional right, we

11

must ask "whether the right was clearly established."). Requiring police officers to exercise clairvoyance, rather than a reasonable understanding of existing law, is a dangerous and unwise precedent we decline to set.

Furthermore, even if Officers Bolton and Grassnig could somehow be required to understand *Randolph* as *Tatman* had not yet interpreted it, *Tatman* is factually distinguishable from the instant case and its holding inapposite. Although *Tatman* found that a co-tenant could effectively withdraw consent to search from the top of a staircase because *Randolph* did not require him to be *literally* "at the door," *Tatman*, 397 F. App'x at 161-63, Tatman objected before the search began. *Id*. at 156. Here, Hays' objection came *after* police had entered his home. Thus, the situation here is one we did not address in *Tatman*, i.e., whether a co-tenant can withdraw his fellow tenant's valid consent after a legitimate search has already begun. In *Randolph*, which *was* clearly established law when these events took place, the Supreme Court answered the question with a resounding "no." *Randolph*, 547 U.S. at 121. While *Tatman* clarified *Randolph* on other points, nothing in that decision undermines this clearly established principle. In sum, although Hays cites *Randolph* in support of his argument in this case, *Randolph*'s holding makes clear that Hays' purported objection came too late to withdraw or otherwise invalidate his daughter's consent for Officers Bolton and Grassnig to enter the home. For these reasons, we affirm the district court's judgment that the officers' ongoing acceptance of Heather's consent to enter the Hays residence was reasonable, did not violate Hays' clearly established constitutional rights, and is protected under the doctrine of qualified immunity.

### 2. Officers Bolton and Grassnig had probable cause to arrest Hays for domestic violence

Finally, Hays argues that even if police could reasonably have searched his home, they lacked probable cause to arrest him for domestic violence. We do not agree. "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Whether probable cause is present "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Id*. We have held that once an officer has sufficient probable cause, he has no duty to conduct a further investigation. *Klein v. Long*, 275 F.3d 544, 551 (6th Cir. 2001). Moreover, in the domestic violence context, police officers need only have a belief in the probability that an offense was committed, even if they lack proof of every element of the crime. *Thacker v. City of Columbus*, 328 F.3d 244, 256 (6th Cir. 2003).

Under Ohio law, domestic violence is committed when a person "knowingly cause[s] or attempt[s] to cause physical harm to a family or household member." Ohio Rev. Code Ann. § 2919.25(A) (West 2010). Where a police officer has "reasonable grounds to believe the offense of domestic violence . . . has been committed and reasonable cause to believe that a particular person is guilty of committing the offense, it is the preferred course of action in [Ohio] that the officer arrest and detain . . . ." Ohio Rev. Code Ann. § 2935.03(B)(3)(b) (West 2011).

Applying the facts of this case to the domestic violence standard under Ohio law, it was reasonable for Officers Bolton and Grassnig to believe that Hays intended to cause physical harm to his daughter. Heather called 911 for officer assistance after her father "threw [her] out of the

13

house," without any shoes at nearly midnight in the middle of the winter with sub-freezing temperatures and snow on the ground. When the officers arrived at the scene, Heather agreed that her father had "grab[bed]," "threw," and "pulled" her outside and that her shoes had come off as he did so. She was visibly upset. Once the officers were inside, Hays refused to come down the stairs or explain his conduct.

While Hays makes much of the fact that Heather neither complained of nor exhibited any injuries, this is hardly dispositive. Under Ohio law, the *intent* to cause a family or household member physical harm is sufficient to constitute domestic violence. *See* Ohio Rev. Code Ann. § 2919.25(A) (West 2010). Whether or not such harm actually came to pass, either when Hays forcibly threw Heather out of the house or when he locked her outside barefoot, is immaterial. Hays also argues that the officers must not have believed that Hays was an aggressor because they allowed Heather to gather her things from a room nearby while they stayed downstairs. Without comment on the wisdom of this decision, this too fails to demonstrate that Hays lacked the intent to harm his daughter. Indeed, Officer Bolton testified that he and Officer Grassnig "still had eyes on [Heather]" when she went upstairs to get her things.

In sum, Heather's representations to the 911 dispatcher and to Officers Bolton and Grassnig, the extremely cold weather, the fact that Heather had been thrown outside with no shoes, and Hays' refusal to explain his conduct supports the officers' decision to arrest him for domestic violence. Under these straightforward circumstances, the officers' conduct did not violate Hays' constitutional rights, much less clearly established protections. Accordingly, we affirm the district court's

judgment that Officers Bolton and Grassnig had probable cause to arrest Hays and that their conduct

is protected by the doctrine of qualified immunity.

### III.  Conclusion

For the reasons set forth herein, we **AFFIRM** the district court's grant of Defendants' motion

for summary judgment.

No. 11-3123
*Hays v. Bolton, et al.*

**KAREN NELSON MOORE, Circuit Judge, concurring in the judgment.** I agree with the majority that Heather Hays had apparent authority to consent to Officers Grassnig's and Bolton's entry into the Hays household. I am unconvinced that the officers did not thereafter violate Edward Hays's Fourth Amendment rights by refusing to leave the house after he objected to their presence, however. *See Georgia v. Randolph*, 547 U.S. 103, 122–23 (2006). Because *Randolph* is unclear as to when a tenant must object in order to override a co-tenant's consent, and because our subsequent clarification of the issue in *United States v. Tatman*, 397 F. App'x 152, 160–62 (6th Cir. 2010), postdates the events at the Hays household that led to this litigation, I can concur in the majority's holding that Grassnig and Bolton are entitled to qualified immunity on the grounds that the contours of the right identified in *Randolph* were not clearly established at the time. The majority's discussion of the scope of *Randolph* is thus unnecessary. Because I also believe that it is incorrect, I must briefly respond.

To the extent that the majority reads *Randolph* as holding that Hays must have objected before the officers entered his home in order to revoke Heather's previously given consent, I disagree for the reasons explained in *Tatman*. *See* 397 F. App'x at 160–63; *see also Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 426 (5th Cir. 2008) (following *Randolph*, "[i]t is only a small step to conclude that a physically present co-occupant may revoke or withdraw the consent given by another occupant" after police have entered). Assuming that the majority's description of *Randolph* as holding that a co-tenant's objection is ineffective "after a legitimate search has already begun" means something other than "after the police have entered," I still question the soundness

16

of this standard. It is unclear at what point after the police enter a residence that a search begins for the purposes of this view of *Randolph*.

Read in context, the better understanding of *Randolph*'s "fine line" rule, 547 U.S. at 121, is that a tenant cannot revoke a co-tenant's previously given consent for the police to enter or search a residence once the police have already discovered contraband or once probable cause for an arrest has been established; similarly, an absent tenant cannot later argue that a search within the residence to which a co-tenant consented was unlawful if the government seeks to use evidence discovered during that search. The Court explained that the purpose of this rule was to align the holding in *Randolph* with *Illinois v. Rodriguez*, 497 U.S. 177 (1990), and *United States v. Matlock*, 415 U.S. 164 (1974), which held that evidence seized in a warrantless search of the defendant's residence was admissible at trial when a third party with actual or apparent common authority had consented to the search, as well as to clarify that officers are not required "to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received." *Randolph*, 547 U.S. at 121–22. Neither purpose is undermined by requiring officers to heed the objection of a co-tenant who arrives on the scene once the police have already entered the house but prior to the seizure of evidence.

With these observations, I concur in the judgment affirming the district court's grant of summary judgment on qualified-immunity grounds.