**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0604n.06

**No. 09-3117**

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

**FILED**
**Sep 13, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| *Plaintiff-Appellant*, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| **DANIEL A. TATMAN**, | ) | |
| | ) | **O P I N I O N** |
| *Defendant-Appellee*. | ) | |

BEFORE:    KENNEDY and COLE, Circuit Judges, and JORDAN, District Judge.[*]

**COLE, Circuit Judge.** Defendant-Appellee Daniel Tatman was indicted on two counts of unlawful possession of a machine gun and one count of transporting, shipping, or receiving a firearm that has had its serial number removed, in violation of 18 U.S.C. § 922(k) and (o). Tatman filed a motion to suppress evidence obtained by law-enforcement officials during four searches of his house that he alleges violated his Fourth Amendment rights. The district court granted Tatman's motion to suppress. The Government appeals the district court's suppression ruling on an interlocutory basis. Based on the following analysis, we **AFFIRM**.

---

[*]The Honorable R. Leon Jordan, United States District Judge for the Eastern District of Tennessee, sitting by designation.

## I. BACKGROUND

Apparently, Tatman used his home, located at 401 Tabernacle Road, Chillicothe, Ohio, to alter and manufacture firearms, including fully automatic weapons, or machine guns. In February 2006, when the initial events giving rise to this case occurred, Tatman and his wife Taresa were separated. Three months earlier, in December 2005, Taresa had left their home to live with Tatman's cousin, Rob Fletcher. She had moved all of her belongings out of the house except a cast-iron skillet over which there was some dispute. Taresa did not return to the house until February 4, 2006. Very early that morning, Taresa came to the house and threatened Tatman that she would tell the authorities about his illegal weapons if he did not give her possession of the house. Tatman agreed to leave the following day. Still, Tatman and Taresa got into an altercation that resulted in Tatman ripping the phone from the wall and physically removing Taresa from the house. Taresa then went to a local general store and called the police alleging domestic violence. Deputy Christopher Clark of the Ross County Sheriff's Office met her and Fletcher in the parking lot of the store.

Based on Taresa's domestic violence allegations and a statement from her that she resided at 401 Tabernacle Road, the police decided to go to the house to arrest Tatman. After an initial trip to Tatman's house at which no one answered the door, the officers went back to the store and Taresa agreed to let them into the house. As soon as Clark opened the door, he encountered Tatman. Clark testified that Tatman consented to his entry, while Tatman testified that he immediately objected to Taresa's and Clark's entry and told Clark that Taresa did not live there and had no right to be there. After a short discussion, Tatman agreed to leave the house, but first went upstairs to collect some personal items. While Tatman was upstairs, Taresa told Clark that Tatman possessed fully automatic

weapons in the house. Clark then went upstairs and discovered three such weapons on a blanket on the floor. He then arrested Tatman for domestic violence, handcuffed him, and took him to a police cruiser.

Once Tatman was in custody, Clark asked Taresa for written consent to conduct a second search of the house. Taresa signed a written consent form and walked through the house with Clark pointing out to Clark places where weapons might be hidden. Clark discovered and seized a number of weapons, including eleven fully automatic weapons.

Two days later, on February 6, 2006, the police sought a search warrant for Tatman's residence to look for additional weapons, since the first two searches were conducted at night, in the dark. Detective David Bower submitted an affidavit in support of the request for the warrant recounting the events of February 4, 2006. A Ross County municipal judge authorized the search warrant and the sheriff's office conducted a third search that same day. During that search, the police discovered an additional fully automatic weapon, suppressors, silencers, and equipment for making silencers.

Eight months later, Scott O'Brien, a federal agent at the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), met with Tatman and arrested him based on a federal arrest warrant. O'Brien requested to search Tatman's house for additional machine guns, marijuana, and evidence of a fugitive whom authorities suspected may have been hiding on Tatman's property. Tatman agreed to allow a search of his house for these purposes and signed a written consent form.

During this fourth search, ATF agents seized a box of gun parts, which included a CZ-26 parts kit.[1]

These parts previously had been seized by the sheriff's office, but had been returned to Tatman.

However, after additional testing conducted by the ATF, the authorities concluded that, under federal

law, the CZ-26 parts kit constituted an illegal machine gun.

On December 12, 2006, Tatman was indicted on two counts of unlawful possession of a

machine gun and one count of transporting, shipping, or receiving a firearm which has had its serial

number removed, in violation of 18 U.S.C. § 922(k) and (o). The district court held an evidentiary

hearing on Tatman's suppression motion that lasted three days. Following the hearing, both parties

submitted additional briefs. On December 31, 2008, the district court issued an order granting

Tatman's motion to suppress in full. On January 26, 2009, the Government filed a timely notice of

appeal.

## II.  ANALYSIS

### A.  Jurisdiction and Standard of Review

This Court has jurisdiction over the Government's appeal of the district court's suppression

ruling on an interlocutory basis because the suppressed evidence provides "substantial proof of a fact

material in the proceeding." 18 U.S.C. § 3731; *see United States v. Purcell*, 526 F.3d 953, 959 (6th

Cir. 2008).

---

[1]O'Brien described a "parts kit" or "trigger group" as a collection of gun parts—springs, triggers, pieces of metal—that can be assembled or reassembled into a firearm. The Government alleges that the CZ-26 parts kit itself is an illegal machine gun because of the ease with which it can be reassembled into a fully automatic weapon.

In reviewing a district court's ruling on a motion to suppress, we review findings of fact for clear error and legal conclusions de novo. *Purcell*, 526 F.3d at 959 (citing *United States v. Waller*, 426 F.3d 838, 843 (6th Cir. 2005)). In doing so, we "draw all factual inferences in favor of upholding the district court's suppression ruling." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (citing *United States v. Dillard*, 438 F.3d 675, 680 (6th Cir. 2006)). A factual finding will be found clearly erroneous only when, after reviewing all of the evidence, this Court "is left with the definite and firm conviction that a mistake has been committed." *Dillard*, 438 F.3d at 680 (internal quotation marks omitted).

## B. First Search

The district court found that the first search of Tatman's home was unconstitutional and accordingly suppressed the evidence discovered based on that search. It reasoned that, although Taresa had apparent authority to consent to Clark's entry when Clark and Taresa initially arrived at the house, Tatman's objection to Clark's entry trumped Taresa's consent under *Georgia v. Randolph*, 547 U.S. 103 (2006). In that case, the Supreme Court addressed the constitutionality of a warrantless home search when one tenant consents and another refuses to consent, and concluded that a physically present tenant's refusal to consent overrides the other tenant's consent. *See id.* at 120. The Government argues that Clark's entry into Tatman's home complied with the Fourth Amendment because, in objecting to Clark's presence, Tatman did not satisfy *Randolph*'s requirement that he be physically present and objecting when Clark entered his house. Further, the Government argues that once Clark entered the house, his subsequent search of Tatman's upstairs bedroom was justified by several of the exceptions to the Fourth Amendment's warrant requirement.

We agree with the district court's determination that Clark's initial entry and search of Tatman's home was unconstitutional under *Randolph*. Therefore, we conclude that the district court properly suppressed the evidence discovered based on this search.

Both Tatman and Clark testified at the suppression hearing about Clark's initial entry into Tatman's home. Their testimony differed on factual issues that are significant in determining whether Clark's initial entry and search was valid. Where in dispute, the district court credited Tatman's testimony over Clark's testimony. As we have noted, we review these factual findings only for clear error and must draw all factual inferences in favor of upholding the district court's decision to suppress the evidence discovered during the first search. *See Panak*, 552 F.3d at 465.

According to Tatman, after he removed Taresa from the house early in the morning of February 4th, he went upstairs to his bedroom to gather his belongings, but eventually went back to sleep. He woke to shouting downstairs. He stated: "I heard someone yelling in the front door. I could see flashlights flashing through the foyer, outside my bedroom door." (District Court Record Entry ("R.E.") 39, vol. 2, at 104.) Tatman further testified: "I got up, and I went to my bedroom doorway. I could see someone down the stairs with a flashlight. And he was yelling 'Ross County Sheriff.'" (*Id.* at 105.) According to Tatman, as he looked down from the top of his stairway, he "could see the officer in the front door. All the lights in the house were off. [Clark] was standing in the doorway with a flashlight," and the door was open far enough that Tatman "could see [Clark's] outline." (*Id.* at 111.) Tatman stated that Clark was standing just inside the door, with "[b]oth feet . . . inside the threshold." (*Id.* at 142.) Tatman described his initial exchange with Clark as follows:

Q.     And [Clark] is actually inside the doorjamb?

A.     He is standing in the doorway.

Q.     Then who makes the next move, and where do they get to?

A.     I asked [Clark] how he got in.  He said the door was open.  And I told him, I said, No, it was not open.  I'd just locked it.

       And he told me, he said, Well, [Taresa] let me in.

. . . .

A.     I told him that she had no right to let him in, she had no right to be there, she did not live there.

Q.     Now, you have an absolute recollection that you made those three statements to that officer?

A.     Yes.  I was very upset because I'd just throwed her out of the house.

Q.     Did you make any comment about his right to be there?

A.     I told [Clark] that she had no right to let him in, they had no right to be there.

Q.     Now, after you said she had no right to be here, did you have some discussion with him about her having possessions there or not?

A.     Yeah.  I told him she did not live there.  And he said, She don't have no possessions here?

       I said, No, there is nothing here.

       I turned on the light, which I had a light switch at the top of the stairway . . . . [This] lit up the foyer.  I turned it on, and I said, She has no possessions here.

       And I kind of told – you know, I said, There ain't nothing here, which there was nothing in the house.  A couple of pieces of furniture, no knickknacks, nothing hanging on the walls.

> And he said, She don't have no clothes or anything here?
>
> And I said, No, she got all that.

(*Id.* at 111-13.)

Tatman testified that he then walked down a few steps and sat on the stairs. At that time, Clark was standing in the foyer, Taresa was standing a "couple of feet outside the door," and there was no one else in the house. (*Id.* at 114.) Tatman stated that "[t]hat's when [Clark] told me that she – he was there for domestic violence and wanted to know if I throwed her – if we had any confrontation. I said, Yes, I throwed her out. I said, She don't live here." (*Id.* at 114.) Tatman testified that, next, "[Clark] told me that she wanted the possession of the house. She started yelling and screaming that she'd tell, and I told him, I said, If I need to go, I'll go. And he said, That would be in your best interest." (*Id.* at 114.) Tatman then "asked [Clark] about getting my stuff. He said, Yeah, you can get your stuff. He said, Just clothes. I went upstairs and started getting dressed." (*Id.*) Tatman testified that he went upstairs unaccompanied to get dressed, while Clark went outside with Taresa, who was yelling. (*Id.* at 115.) According to Tatman, Clark did not tell him that he was under arrest, or place him under arrest, prior to his going upstairs:

> Well, I went upstairs. I already had some guns laying out, because I started packing
> up earlier that night, because I was planning on leaving the next day. I went upstairs,
> started getting my clothes gathered up, got my pants on, and [Clark] came up, picked
> up a gun, started looking at it, and cuffed me.

(*Id.* at 116.) Tatman testified that Clark then led him into a police cruiser thirty or forty feet from the front door. Tatman observed the ongoing activity in his house from the backseat of the cruiser.

Clark testified to a much different version of events. According to Clark, as he approached,

he shined his flashlight into Tatman's house through the windows on the front door. He stated:

> I can't really recall what exactly happened at that point. Next thing that I'm a
> hundred percent sure that happened was I shined my light. I'm not sure if [Taresa]
> opened the door a crack or if [Tatman] came down and opened the door, but I shine
> my light at one point, and he was on a loft. And I let him know I could see him, and
> I spotlighted him with my light to let him know I could see him, and he came down
> and opened up the door, and I explained who I was and why I was there, and I
> stepped in the house, but he opened the door.
>
> Now, whether or not [Taresa] unlocked it and cracked it so I could yell in or
> not or was getting ready to go in, I can't say for sure, because I just can't remember.

(R.E. 39, vol. 1, at 32-33.) Clark testified that, after introducing himself, he told Tatman that he was

there investigating the domestic-violence incident. According to Clark, Tatman never protested his

or Taresa's entry into the house, never told him that he did not have a right to be in the house, and

never told him to leave the house. Clark testified that they then had a conversation in which Taresa

informed him that there were fully automatic weapons in the house and Tatman "confirmed that

there were weapons." (*Id.* at 40.) Clark stated that Tatman acted cooperatively and led him upstairs

to look at the weapons. When he saw the weapons on the blanket on the floor of the upstairs

bedroom, Clark testified that he placed Tatman in handcuffs and arrested him for domestic violence.

As noted above, the district court resolved the factual disputes based on Tatman's and Clark's

conflicting testimony in Tatman's favor, concluding that Tatman's testimony about both the entry

and whether he objected to Clark's presence was more credible than Clark's testimony. In doing so,

the court noted that Tatman's version of events was corroborated by sworn affidavits from Taresa

and Fletcher and was consistent with the undisputed story of what had taken place earlier that

night—Tatman had physically removed Taresa from the house after she threatened to report his possession of illegal guns to the police. Accordingly, the court concluded that Tatman did not consent, and in fact objected, to Clark's initial entry. The district court's factual findings regarding Clark's entry are supported by Tatman's testimony and the Government does not contend that the court clearly erred in making these findings. Therefore, we adopt these findings for our analysis.

The question for this Court to resolve is whether Tatman's objections to Clark's entry invalidated Taresa's consent for the police to enter Tatman's home and arrest him. The Government argues that Clark's entry into the home was constitutional because Tatman objected from the top of the stairs once Clark was already in his doorway and that his objection therefore does not meet *Randolph*'s requirements of physical presence and contemporaneousness. This argument is unpersuasive. An examination of *Randolph* reveals that, under this set of facts, Tatman qualifies as a "physically present fellow tenant [who] object[ed]" to Clark's entry rather than a nearby, "potential objector." *Randolph*, 547 U.S. at 121.

The search in *Randolph* arose under similar circumstances. The *Randolph* defendant's wife had moved out of their house roughly a month earlier, but had returned the morning that the search took place and called the police based on a domestic dispute. *Id.* at 106-07. Once the police arrived, "she told them that her husband was a cocaine user" and "volunteered that there were items of drug evidence in the house." *Id.* at 107 (internal quotation marks omitted). One of the officers asked the defendant for consent to search the house, "which he unequivocally refused." *Id.* The officer then asked his wife for consent to search, "which she readily gave." *Id.* The police searched the house and discovered cocaine, which eventually led to his indictment for cocaine possession. *Id.*

The Court concluded that the search of the *Randolph* defendant's home was unlawful based on his contemporaneous refusal to consent. In doing so, the Court analogized to social invitations:

> [I]t is fair to say that a caller standing at the door of shared premises would have no confidence that one occupant's invitation was a sufficiently good reason to enter when a fellow tenant stood there saying, 'stay out.' Without some very good reason, no sensible person would go inside under those conditions.

*Id.* at 113. The Court reasoned that because the consenting party "has no recognized authority in law or social practice to prevail over a present and objecting co-tenant, his disputed invitation, without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all." *Id.* at 114. The Court therefore held "that a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Id.* at 120. Thus, police officers are not permitted to balance or weigh one co-tenant's consent against another co-tenant's non-consent; if one occupant objects, the police cannot enter a residence, without a warrant, based on the consent of another occupant.

In so holding, the Court was careful not to overturn the holdings of two earlier cases, *United States v. Matlock*, 415 U.S. 164 (1974), and *Illinois v. Rodriguez*, 497 U.S. 177 (1990), in which the Court recognized the constitutionality of searches conducted based on consent given by third parties with common or apparent authority over the premises to be searched. *See Randolph*, 547 U.S. at 121. The Court noted that the defendants in *Matlock* and *Rodriguez* never objected to the police search before it began—the *Matlock* defendant because he was in a nearby squad car and the *Rodriguez* defendant because he was asleep in his apartment when the police entered and discovered

contraband. *See id.* To distinguish these cases, the Court "dr[ew] a fine line; if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not involved to take part in the threshold colloquy, loses out." *Id.* The Court identified "practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication when he expresses it." *Id.* at 121-22. The Court chose this dichotomous system and avoided a holding "that reasonableness required the police to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received." *Id.* at 122.

Tatman, like the *Randolph* defendant, clearly and unequivocally objected to the police officer's presence before the search began. While Clark was standing in Tatman's front doorway, Tatman stated that neither Clark nor Taresa had any right to be in his house. Moreover, Tatman informed Clark that, contrary to her earlier assertions, Taresa did not live in the house and attempted to show Clark that she had no belongings in the house. These statements not only made clear that Tatman was not consenting to Clark's entry but also called into question Taresa's apparent authority to consent to Clark's entry. As we have stated, "if a potential defendant with self interest in objecting to the search is present and actually objects, then a third party's permission does not suffice for a reasonable search." *United States v. Ayoub*, 498 F.3d 532, 537 (6th Cir. 2007) (citing *Randolph*, 547 U.S. at 121).

The Government attempts to distinguish *Randolph* because, by the time Tatman made his way from his bed to the top of the stairs where he voiced his objection, Clark already had opened the

door and was standing in the doorway. But the distinction that the Government urges us to make stands at odds with the *Randolph*'s holding. The Government relies heavily on *Randolph*'s description of a successfully objecting co-tenant as someone who "is in fact at the door and objects," rather than "the potential objector, nearby but not invited to take part in the threshold colloquy." *Id.* However, we note that the Court varied the language it used to describe a person in the *Randolph* defendant's position, indicating that it did not intend the "at the door" language to be talismanic. *See, e.g.*, *Randolph*, 547 U.S. at 106 (someone who "is present at the scene and expressly refuses to consent"); *id.* ("a physically present co-occupant[] [who has] stated [his] refusal to permit entry"); *id.* at 108 ("a co-tenant who is present and states a refusal to permit the search"); *id.* at 109 ("a second occupant physically present and refusing permission to search"); *id.* at 114 ("a present and objecting co-tenant"); *id.* at 119 (a co-tenant "standing at the door and expressly refusing consent"); *id.* at 120 ("the express refusal of consent by a physically present resident"); *id.* at 121 ("a physically present fellow tenant [who] objects"); *id.* ("a potential defendant with self-interest in objecting [who] is in fact at the door and objects" as opposed to a "potential objector, nearby but not invited to take part in the threshold colloquy"); *id.* (a "fellow occupant on hand" who objects). Further, the *Randolph* Court couched its holding in this language for the explicit reason of preserving the *Matlock* and *Rodriguez* holdings, both of which are distinguishable from the case at hand. In *Matlock*, the defendant did not object because he was arrested in the front yard of his house and was being detained in a police car when the police approached his front door and were granted consent to search. *See Matlock*, 415 U.S. at 166; *see also id.* at 179 (Douglas, J., dissenting). Like Tatman, the *Rodriguez* defendant was asleep in his bedroom when the police arrived at his home. *See*

- 13 -

*Rodriguez*, 497 U.S. at 180. However, unlike Tatman, he did not wake up (let alone object), until after the police entered his home and discovered the contraband sought to be suppressed. *See id.* What is significant is that Tatman was physically present and *actually objected* while Clark was standing at the threshold of his house before the search began, distinguishing him from the nearby, "potential objector[s]" in *Matlock* and *Rodriguez*. *Randolph*, 547 U.S. at 121. That he voiced this objection from the top, rather than the foot, of his staircase does not change this fact.

This separates Tatman's case from a number of our past cases that rejected *Randolph*-based suppression challenges where the defendant did not object, but argued that the search was unconstitutional because the police failed to provide a fair opportunity to do so. These arguments are based on *Randolph*'s warning against upholding searches where there is "evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." *Randolph*, 547 U.S. at 121; *see, e.g.*, *United States v. Stanley*, 351 F. App'x 69, 72 (6th Cir. 2009) (rejecting a suppression argument based on *Randolph* because, while the defendant was present when the co-tenant gave consent, he "did not refuse to consent to search the apartment" and "did not object after [the co-tenant] gave her consent"); *United States v. Penney*, 576 F.3d 297, 309 (6th Cir. 2009) (rejecting *Randolph*-based argument where defendant did not object but was never asked for consent even though he "was in custody at the same police station when and where" his co-tenant gave consent); *United States v. Davis*, 283 F. App'x 370 (6th Cir. 2008) (rejecting suppression argument because "[a]t the time the search was conducted, [the defendant] was asleep in the house and did not respond to the police officers' request to gain entry" and thus "was unavailable to object to the search and did not in fact refuse consent"); *Ayoub*, 498 F.3d at 540-41

(rejecting defendant's allegation that the police intentionally bypassed him in order to ask someone else with apparent authority for consent to search). In sharp contrast to the defendants in these cases, Tatman actually objected to Clark's entry and did so while Clark was still standing in his front doorway and well before the search began. Therefore, Clark's initial entry and search of Tatman's house was unconstitutional under *Randolph*.

Further, even if we were to find that Tatman's objections to Clark's entry came too late or from too far a distance to invalidate the search under *Randolph*, Tatman's objections would operate as a withdrawal of Taresa's consent. A person who consents to a warrantless search has the right to restrict the scope of the search. *See Florida v. Jimeno*, 500 U.S. 248, 252 (1991). This includes the concomitant right of the consenting party to withdraw his or her consent once the search has begun. *See United States v. Buckingham*, 433 F.3d 508, 513 (6th Cir. 2006); *Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir. 1999) ("[T]he consenting party may limit the scope of [the] search, and hence at any moment may retract his consent."); *cf. Randolph*, 547 U.S. at 107 (noting that the defendant's wife "withdrew her consent" and that the police did not continue their search until after obtaining a search warrant). It stands to reason that because a physically present co-occupant's denial of consent overrides another co-occupant's consent, and a consenting party can withdraw his or her consent at any time during the course of a search, Tatman's objection to Clark's presence at the very least operated to withdraw the consent previously given by Taresa. *Cf. Stanley*, 351 F. App'x at 72 (noting that the defendant "did not object *after* [his co-tenant] gave her consent" (emphasis added)); *United States v. Jones*, 335 F.3d 527, 531 (6th Cir. 2003) (noting that had the unauthorized consent given by an employee handyman been valid, it "would have ceased at the point

that [the owner] denied consent to a search"). We have held that upon such a revocation, a previously valid consensual search "should [be] terminated instantly" and "the officers should . . . promptly depart[] the premises (assuming they possess[] no independent legal authority to remain)." *Painter*, 185 F.3d at 567. Therefore, Tatman's objections at the very least operated as a withdrawal of Taresa's consent such that Clark was prohibited from remaining in the house absent some other lawful justification for his presence.[2]

Because of Tatman's objections, Clark's warrantless entry into and subsequent search of Tatman's home was unconstitutional. The Government presents three additional arguments as to why the search was legal, all of which fail because Clark's entry was unconstitutional under *Randolph*. The Government first argues that the search was legal because it was a search incident to a lawful arrest. This argument fails because the arrest was not legal; although Clark may have had probable cause to arrest Tatman for domestic violence, Clark was not permitted to enter Tatman's home to arrest him without a warrant or exigent circumstances. *See Kirk v. Louisiana*, 536 U.S. 635, 638 (2002); *Payton v. New York*, 445 U.S. 573, 590 (1980). The Government next argues that the search was lawful because Clark, as an arresting officer, was entitled to stay at Tatman's elbow when he went upstairs. However, as we have established, Clark's entry into the house to arrest Tatman violated the Fourth Amendment. Further, as the district court found, and as both Clark and Tatman testified, Clark did not place Tatman under arrest until after they both were upstairs. Finally, the

---

[2]For example, if Clark had discovered illegal contraband in plain sight *before* Tatman objected, Clark may have been permitted to remain. Here, however, Tatman objected while Clark was still standing in the front doorway. Moreover, Clark had no reason to believe that Tatman possessed illegal weapons until after their discussion ended and Tatman went upstairs.

Government contends that Clark's search can be justified by exigent circumstances. This argument

fails because Clark did not become aware of the possibility that Tatman possessed illegal weapons

until after he illegally entered the house. Further, "[e]vidence that firearms are within a residence,

by itself, is not sufficient to create an exigency." *United States v. Bates*, 84 F.3d 790, 795 (6th Cir.

1996). The presence of a weapon can create an exigent circumstance if "the government is able to

prove they possess information that the suspect was armed and likely to use a weapon or become

violent." *Id.* Here, Tatman was unarmed and Clark testified that Tatman "was cooperative. As a

matter of fact, . . . my lieutenant actually had cleared the scene because [Tatman] wasn't violent. He

wasn't causing a problem." (R.E. 39, vol. 1, at 41.) Therefore, no exigent circumstances existed to

justify Clark's warrantless search.[3]

Based on the foregoing analysis, we conclude that the first search of Tatman's home violated

Tatman's Fourth Amendment rights. Therefore, the district court was correct in suppressing the

evidence obtained based on that search.

---

[3]The dissent contends that exigent circumstances did justify this first search of Tatman's home. We note that it is the Government's burden to prove that an exigency existed, *Bates*, 84 F.3d at 794, and, as mentioned above, we do not believe that the Government has satisfied this burden. Further, the dissent provides no justification for applying the exigent-circumstances doctrine retroactively to rectify the *Randolph* violation that already had occurred when the alleged exigency arose. Moreover, "an officer cannot manipulate a situation as to create [an] exigency." *United States v. Atchley*, 474 F.3d 840, 850-51 (6th Cir. 2007). Had Clark not entered Tatman's home illegally, there would have been no risk of Tatman using the weapons to harm anyone because, before Clark's entry, there was no one else present in the home. *See United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994) (noting that once the police had removed from the house the person in danger, exigent circumstances could not justify a search of the house which resulted in the discovery of firearms).

**C. Second Search**

The district court concluded that the second search of Tatman's home, conducted the same night as the first search but after Tatman had been arrested and Taresa had signed a written consent form, also was unlawful because Taresa's consent was not voluntary and, even if her consent had been voluntary, she no longer had apparent authority to consent to the search. The Government contests both findings. We conclude that the district court's conclusions were correct in both regards. Therefore the court properly suppressed the evidence discovered based on this search.

*1. Voluntariness*

"Whether consent is voluntary is a question of fact determined from the totality of the circumstances." *United States v. Lopez-Medina*, 461 F.3d 724, 737 (6th Cir. 2006). As a finding of fact, this determination is reviewed for clear error and we "cannot reverse absent a definite and firm conviction that a mistake has been committed." *Id.* (internal quotation marks omitted). Moreover, we must "draw all factual inferences in favor of upholding the district court's suppression ruling." *Panak*, 552 F.3d at 465. The Government has the burden to prove "through clear and positive testimony that the consent to search was given voluntarily. Consent is voluntary when it is unequivocal, specific and intelligently given, uncontaminated by any duress or coercion." *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998) (internal quotation marks and citations omitted). This determination is based on the totality of the circumstances, and this Court has identified a number of factors that are often relevant to this consideration including the age, intelligence, and education of the individual giving consent, whether the individual understands that he or she has a right to refuse consent, whether the individual understands his or her constitutional rights, the length

and nature of any detention, and to what extent the police engaged in coercive or punishing conduct. *See, e.g.*, *United States v. Elkins*, 300 F.3d 638, 647 (6th Cir. 2002). Part of this Court's voluntariness analysis is a consideration of "the circumstances surrounding the search for 'more subtle forms of coercion that might flaw [an individual's] judgment." *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008) (alteration in original) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)).

The Government presents three arguments for why the district court's finding that Taresa's consent was involuntary was clearly erroneous. First, the Government contends that Taresa's consent was voluntary because the consent form she signed included a clause stating that she had a right to refuse to consent to the search and a right to refuse to sign the form. Although "'knowledge of the right to refuse consent is one factor to be taken into account,'" *United States v. Worley*, 193 F.3d 380, 387 (6th Cir. 1999) (quoting *Schneckloth*, 412 U.S. at 227), we do not find the inclusion of this statement in the sheriff's office's standard consent form alone to be particularly persuasive in light of the surrounding circumstances. Taresa signed the consent form in the middle of the night, after the domestic dispute with Tatman, and just after Tatman was taken in handcuffs into the back of a police cruiser. Under these circumstances, it seems quite likely that Taresa did not even read this statement contained in the consent form, let alone intelligently consider its meaning. It was not clear error for the district court to discount the statement included in Taresa's written consent form in making its voluntariness determination. *See Buckingham*, 433 F.3d at 514 (holding that a signed consent form was not sufficient evidence to affirm the district court's finding of voluntariness).

Second, the Government points to the fact that Taresa never testified that her written consent was given involuntarily[4] and contends that the statements in her affidavit were not sufficient to demonstrate voluntariness. Taresa's affidavit stated: "[T]he young deputy presented me with a paper and told me it would be in my best interest to sign it because it would allow them to enter the residence and search it and would protect me from being involved and losing my home." (Tatman app. 6.) A similar affidavit submitted by Fletcher stated:

> [Clark] asked if Taresa would consent to him searching the residence. She answered she didn't know what to do. She stated she was not living there. She stated that the house was subject to divorce proceedings and she did not want to lose it because it was important to her and to the children. The deputy told her that if she did not consent he would go back and obtain a search warrant. It was in her interest to sign a consent.

(*Id.* at 2.) The Government filed a stipulation with the district court specifically agreeing not to object to the admissibility of these affidavits. Therefore we reject the Government's argument that these statements are insufficient because they were presented by way of affidavits rather than live testimony. *Cf. United States v. Kellogg*, 202 F. App'x 96, 102 (6th Cir. 2006) (holding that the district court did not commit clear error in crediting hearsay evidence—the transcript of a police interview—over contradictory live testimony, in ruling on a motion to suppress). The Government is correct to point out that Taresa's affidavit never explicitly stated that her consent was given involuntarily. However, in doing so, the Government fails to acknowledge that it had the burden to show that Taresa's consent was given intelligently and voluntarily. It was not Tatman's burden to

---

[4]Indeed, Taresa never testified at all. Apparently, Taresa and Fletcher asserted their Fifth Amendment rights not to testify at the suppression hearing.

show involuntariness. Further, the district court noted that while Clark denied threatening Taresa, he "stated that it is possible that he may have told her that it would not hurt to cooperate." (Dist. Ct. Op. 30.) Cultivating someone's fear of criminal prosecution or losing their family's home is an example of a "more subtle form[] of coercion that might flaw [an individual's] judgment." *Moon*, 513 F.3d at 537. Finally, aside from the statement on the written consent form, the Government's argument that Taresa's consent was voluntary is based primarily on Clark's testimony. The district court repeatedly called Clark's credibility into question and credited Tatman's testimony over contradictory testimony from Clark. Thus the fact that the court gave Taresa's affidavit more weight than Clark's testimony is not surprising. *Cf. Ivy*, 165 F.3d at 401 ("[A] district court's credibility finding carries considerable weight. . . . [F]indings of fact anchored in credibility assessment are generally not subject to reversal upon appellate review.").

Finally, the Government points to the fact that Taresa was the person who called the police and informed them about Tatman's weapons, and argues that "[i]t would be exceedingly strange for her to tell the police about the guns, but then not want to permit them to find the guns." (Gov't Br. 30.) However, intervening between these first two acts and her signing of the consent form, Taresa saw her husband handcuffed, led outside by police, and placed in the back of a police cruiser. Regardless of her earlier actions, seeing this may have given her pause about permitting the police to search further.

Based on the foregoing analysis, we conclude that the district court's factual finding that Taresa's written consent was given involuntarily was not clearly erroneous.

## 2. Apparent Authority

Even if the Government were able to show that the district court clearly erred in finding that Taresa's consent was involuntary, the second search of Tatman's home still would be illegal because Taresa lacked apparent authority to consent to the search at the time she signed the consent form.[5] The Government argues that the district court erred in concluding that Taresa lacked apparent authority to consent to the search of Tatman's home after Tatman informed Clark that Taresa no longer lived there. We conclude that, at the very least, the circumstances surrounding the second search created ambiguity such that Clark had a duty to further inquire into Taresa's authority to consent to the search of the house before conducting a search in reliance on her consent.[6]

"The apparent-authority doctrine excuses otherwise impermissible searches where the officers conducting the search 'reasonably (though erroneously) believe that the person who has consented' to the search had the authority to do so." *United States v. Taylor*, 600 F.3d 678, 681 (6th Cir. 2010). "'Apparent authority is judged by an objective standard. A search consented to by a

---

[5]The Government does not argue that Taresa had actual authority to consent to a search of Tatman's house.

[6]Because we conclude that Taresa lacked apparent authority to consent to the search when she signed the consent form, we decline to address whether Tatman's earlier objection to Clark's entry trumps Taresa's subsequent consent after Tatman was taken into police custody and removed from the house. A circuit split has emerged on this issue. The Ninth Circuit has held that the earlier refusal to consent invalidates such a search in regards to the objecting co-tenant. *See United States v. Murphy*, 516 F.3d 1117 (9th Cir. 2008) ("Once a co-tenant has registered his objection, his refusal to grant consent remains effective barring some objective manifestation that he has changed his position and no longer objects."). In contrast, the Seventh and Eighth Circuits have held that the subsequent consent trumps the earlier refusal to consent because an earlier objection does not satisfy *Randolph*'s physical-presence requirement. *See United States v. Henderson*, 536 F.3d 776, 783-84 (7th Cir. 2008); *United States v. Hudspeth*, 518 F.3d 954, 960-61 (8th Cir. 2008) (en banc).

third party without actual authority over the premises is nonetheless valid if the officers reasonably could conclude from the facts available that the third party had authority to consent to the search.'" *United States v. Morgan*, 435 F.3d 660, 663 (6th Cir. 2006) (quoting *United States v. Hunyady*, 409 F.3d 297, 303 (6th Cir. 2005)).

When police are conducting a search pursuant to a person's consent and circumstances arise that create ambiguity as to whether the person who consented actually had authority to consent to the search, the police have a duty to take affirmative steps to confirm that the person who consented actually had such authority. *United States v. Waller*, 426 F.3d 838, 846-49 (6th Cir. 2005). "[A]pparent authority cannot exist if there is ambiguity as to the asserted authority and the searching officers do not take steps to resolve the ambiguity." *Purcell*, 526 F.3d at 963. Thus, in *Purcell*, this Court "conclude[d] that the discovery of . . . men's clothing in [a] duffle bag that [a woman] claimed was hers created ambiguity sufficient to erase her apparent authority and necessitated that the officers reestablish [the woman's] apparent authority." *Purcell*, 526 F.3d at 965. Because the officers failed to take steps to resolve this ambiguity, this Court determined that the firearm the police found in the bag was discovered as part of an illegal search and had been suppressed properly. *Id.*

> Once ambiguity erases any apparent authority, it is not difficult for the searching officers to reestablish the would-be-consenter's authority. The options for searching officers are simple: either they may get a warrant, or they may simply ask the would-be-consenter whether he or she possesses the authority to consent to the search . . . .

*Purcell*, 526 F.3d at 964.

Tatman informed Clark that Taresa did not live in the house, had no right to be in the house, and had no authority to let Clark into the house. Further, he told and visually demonstrated to Clark

that Taresa no longer had any possessions in the house. At the very least, these statements made it unclear as to whether or not Taresa had authority to consent to a search of the house. *See Rodriguez*, 497 U.S. at 188 ("Even when the invitation [to search] is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry."). Therefore, before carrying out the second search of the house based on Taresa's consent, Clark was required to make further inquiry into her authority. *See Garcia v. Dykstra*, 260 F. App'x 887, 899-901 (6th Cir. 2008). This would not have been an onerous task since Clark already was speaking with Taresa and Tatman was in custody in a police cruiser nearby. *See Waller*, 426 F.3d at 849 ("The officers' failure to make further inquiry is especially pronounced in this case because [the consenting party] was in the next room . . . and [the potential defendant] was being detained outside the apartment."). Therefore, even if Taresa had consented to the second search voluntarily, this consent could not provide the basis for a valid warrantless search because Tatman's statements sufficiently undermined Taresa's apparent authority to consent to a search of the house, such that Clark was required to make further inquiry into the issue.

**D. Validity of Warrant and Third Search**

Two days after the first two searches, the Ross County Sheriff's Office obtained a search warrant for Tatman's house based on an affidavit made by Detective David G. Bower and conducted a third search of Tatman's house the same day. The district court concluded that this search was unconstitutional because the supporting affidavit was tainted by the fruits of the two previous, illegal searches and, after excising the tainted portions of the affidavit, the statements remaining were

insufficient to establish probable cause. Based on the same reasoning, the district court found that the warrant also could not be used to admit the fruits of the first two searches under the inevitable-discovery doctrine. The Government challenges both of these findings.[7]

"Whether a search warrant affidavit establishes probable cause to conduct [a] search is a legal question that this Court reviews de novo." *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010). In this analysis, this Court accords the issuing magistrate's determination "great deference." *Id.* (internal quotation marks omitted). Although we must view the evidence in the light most likely to support the district court's decision, where, as here, the district court is itself a reviewing court, there is no reason to treat its conclusions with particular deference. *Id.* Finally, our analysis "look[s] only to the four corners of the affidavit; information known to the officer but not conveyed to the magistrate is irrelevant." *Id.* "In order to conclude that an affidavit establishes probable cause, the issuing judge must find that 'given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009) (alteration in original) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

The facts set forth in Bower's affidavit read as follows:

---

[7]The Government also argues that the district court erred in redacting the affidavit because the earlier searches were legal. This argument fails because, as set forth above, the first two searches were illegal. Before the district court, the Government argued that even if the warrant was technically deficient, the evidence discovered during the third search was admissible because the police relied on the warrant in good faith. The Government has abandoned this good-faith argument on appeal.

1.    The Affaint [sic] is a ten-year veteran of law enforcement and is currently assigned as a Detective within the Ross County Sheriff's Office Detective Division. The Affiant received initial training through the Ohio University Southern Ohio Police Officer Training Academy and has received advanced training through the Ohio Police Officer's Training Academy.

2.    On February 4, 2005, the Ross County Sheriff's Office was summoned to 401 Tabernacle Rd. reference [sic] a complaint of Domestic Violence. The responding Deputy obtained information from the victim and an arrest was made stemming from the complaint.

3.    While at the scene, the Deputy was advised by the victim that the suspect was in possession of fully automatic firearms. The victim gave consent and a search was conducted for the alleged firearms.

4.    During this search a number of non-registered fully automatic weapons were discovered, these weapons where [sic] concealed in the attic of this residence. Also a number of other weapons were located throughout this residence.

5.    While checking the non-modified weapons it was discovered and confirmed that one weapon had been reported stolen from Clark County Ill [sic] in 1996. This weapon is described as being a Diawa .12 gauge shotgun. Confirmation of this stolen weapon was obtained from law enforcement from Ill.

6.    Affaint [sic] additionally discovered technical drawings and instructions to assist in the conversation [sic] of semi automatic weapons to fully automatic weapons.

7.    Affaint [sic] later learned that a workshop had been used to manufacture and alter parts and weapons to convert them into fully automatic weapons.

(Gov't app. 6.) However, the majority of this information is tainted because it was obtained during the previous illegal searches. Therefore, "[t]he critical question to be determined is whether the affidavit, apart from the tainted information that is either inaccurate or illegally obtained, provides the requisite probable cause to sustain a search warrant." *United States v. Hammond*, 351 F.3d 765, 771 (6th Cir. 2003) (citing *United States v. Charles*, 138 F.3d 257, 263 (6th Cir. 1998)). After

excising the tainted portions of the affidavit, only three pieces of information remain: (1) the biographical information about Bowers in the first paragraph, (2) the information about the domestic-violence incident and arrest in the second paragraph, and (3) the statement in the third paragraph that, "[w]hile at the scene, the Deputy was advised by the victim that the suspect was in possession of fully automatic firearms."  (Gov't app. 6.)

Looking to the four corners of the excised affidavit, we conclude that it was not sufficient to establish probable cause to search Tatman's home for fully automatic weapons because (1) there is no indication as to the reliability of the source of the information nor is there any independent corroboration of the information, and (2) the information is too vague and generalized to establish the requisite nexus between the place to be searched and the items sought.

The first problem with the affidavit is that it contains no information whatsoever about the reliability of Taresa, who is unnamed, as an informant and no independent corroboration of the information she provided.  In *United States v. Allen*, 211 F.3d 970 (6th Cir. 2000) (en banc), we held that "where a known person, named to the magistrate, to whose reliability an officer attests with some detail, states that he has seen a particular crime and particular evidence, in the recent past, a neutral and detached magistrate *may* believe that evidence of a crime will be found." *Id.* at 976.  We applied this framework in *Hammond*, which addressed whether an affidavit—that was redacted in part because it contained information from a previous illegal search—supported a finding of probable cause where three substantive pieces of information remained after redaction: (1) a tip from a named informant that there was marijuana on the property in question, (2) police verification of the property's address, and (3) a report of several anonymous phone calls vaguely complaining about

marijuana being grown on the property. *See Hammond*, 351 F.3d at 771. This Court held that the informant's tip "d[id] not pass the *Allen* test and, therefore, cannot constitute probable cause on its own" because the officer "did not provide any detail as to the reliability of the named informant" nor did he even state that the informant "was a 'reliable source' or that he had given the police reliable information in the past." *Id.* at 772. Further, this Court found that the other two pieces of information—the verification of the address and the anonymous phone calls—were not "substantial enough to corroborate [the informant's] tip for purposes of probable cause." *Id.* at 773; *see also United States v. Leake*, 998 F.2d 1359, 1365 (6th Cir. 1993) (finding that affidavit based mainly on an anonymous phone tip did not provide probable cause because of lack of police corroboration and because the caller did not provide the residents' names nor the date upon which he allegedly saw and smelled the marijuana in the residence)

In a more recent case addressing this issue, *United States v. Higgins*, 557 F.3d 381 (6th Cir. 2009), the informant, who had been caught with cocaine in his car, confessed to police officers that he bought the cocaine from the defendant at the defendant's apartment. *See id.* at 385. This Court concluded that the informant's tip was insufficient to support probable cause despite the fact that the informant's identity was revealed to the magistrate and his statement carried some inherent indicia of credibility since it was an admission of a crime. *Id.* at 389-90. First, this Court noted that the affidavit did not attest to the informant's reliability and found that the tip was not sufficiently corroborated by police investigation—despite the fact that the other passengers in the car confirmed the story and the police confirmed that the defendant lived at the residence and had a drug-related criminal history. *Id.* Second, this Court found that there was an insufficient nexus between the place

to be searched and the evidence sought because the affidavit "d[id] not assert that the informant had been inside [the defendant's] apartment, that he had ever seen drugs or other evidence inside [the defendant's] apartment, or that he had seen any evidence of a crime other than the one that occurred when [the defendant] sold him drugs." *Id.* at 390.

The affidavit in this case does not meet any of the prerequisites that would obviate the need for independent police corroboration. First, Taresa is not named in the affidavit, she is identified only as "the victim," and there is no indication that she was identified to the magistrate. Second, Bower does not attest to Taresa's reliability in any way whatsoever, let alone "with some detail." *Allen*, 211 F.3d at 976. Third, Taresa's statement that Tatman "was in possession of fully automatic firearms" does not include any detail about the type, number, or location of the firearms; it does not provide that her knowledge was based on direct personal observation; and, even assuming that it was, it gives no indication of how recently her observation occurred. *See United States v. Smith*, 182 F.3d 473, 481 (6th Cir. 1999) ("[I]t is when there is no indication how an informant came by his information that explicitness of detail is needed."). Therefore, Taresa's statement alone cannot provide probable cause without the inclusion of independent police corroboration in the affidavit. While the affidavit originally did contain such information, it cannot support a finding of probable cause because all of this information was itself the fruit of the previous illegal searches. *See Hammond*, 351 F.3d at 769 (declining to consider corroborating thermal-imaging evidence included in the affidavit because it was the result of an illegal search).

Moreover, even if the affidavit did include the indications of reliability or corroboration needed to make Taresa's statement adequate to provide probable cause, the statement itself is

insufficient to establish a nexus between Tatman's house and the items to be seized. In order to establish the requisite nexus between evidence sought and the location to be searched, "the affidavit must suggest 'that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought' and not merely 'that the owner of property is suspected of crime.'" *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978)). In *McPhearson*, the defendant was arrested on a warrant for simple assault at his residence and when police searched his person incident to this arrest, they found a small amount of crack cocaine in his pocket. *Id.* at 520-21. The police then obtained a search warrant to look for drugs and drug trafficking-related items based on an affidavit describing their discovery of crack cocaine during the arrest. *Id.* at 521. This Court upheld the district court's conclusion that the affidavit was insufficient to establish probable cause because "[t]he affidavit . . . did no more than state that [the defendant], who resided at the [residence in question], was arrested for a non-drug offense with a quantity of crack cocaine on his person." *Id.* at 524. Because the affidavit contained no additional facts "connecting [the defendant] to drug trafficking"—such as a statement that the defendant was a known drug dealer—there was not a sufficient nexus established between the location to be searched and the evidence sought. *Id.* at 525.

Similarly, once the tainted information is excised from the supporting affidavit in this case, the only information that it conveys is that Tatman was arrested for a non-weapons crime (domestic violence), and a hearsay statement from the victim of that crime that he possessed illegal weapons. The *McPhearson* defendant's actual possession of illegal drugs while he was arrested at his residence was insufficient to establish the requisite nexus to search for drugs in the residence. It follows that

Taresa's unsupported allegation that Tatman possessed fully automatic weapons when he was arrested unarmed for an unrelated crime was insufficient to establish the requisite nexus between Tatman's house and illegal weapons. Indeed, with the tainted portions of the affidavit removed, there is not even any indication of where Tatman allegedly possessed these weapons—whether that be his house or anywhere else. *See Zurcher*, 436 U.S. at 555 ("Search warrants are not directed at persons; they authorize the search of places and the seizure of things . . . ." (internal quotation marks and brackets omitted)).

In sum, taking into account the totality of the circumstances, we conclude that the facts included in the redacted affidavit connecting Tatman's home to illegal weapons "were too vague, generalized, and insubstantial to establish probable cause." *United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004) (en banc). Therefore, the third search of Tatman's home was unconstitutional and the district court correctly suppressed the evidence discovered based on that search. Further, because the third search was illegal, the Government's argument that the fruits of the first two illegal searches were admissible under the inevitable-discovery doctrine also fails.

**E. Fourth Search: Scope of Tatman's Written Consent and Plain-View Doctrine**

Finally, the Government challenges the district court's conclusion that the fourth search of Tatman's home, which resulted in the discovery of a CZ-26 parts kit that the Government contends is an illegal machine gun, was unconstitutional because the evidence seized by police in the search exceeded the scope of Tatman's consent. The Government contends that the scope-of-consent doctrine did not prohibit the seizure of the parts kit because it was discovered in a location where the contraband they had permission to search for could have been discovered. We agree that the

district court misapplied the scope-of-consent doctrine. However, we conclude that the parts kit discovered during the fourth search was suppressed properly because it was not immediately incriminating and, therefore, its seizure was not permitted under the plain view doctrine.

Roughly eight months after the initial three searches of Tatman's home, Scott O'Brien, a federal ATF agent working on Tatman's case, received information from the Ross County Sheriff's Office that Tatman possibly was in possession of additional machine guns, growing marijuana, and helping harbor John Parsons, a fugitive accused of shooting a police officer. (Tatman and O'Brien previously had spoken when Tatman was seeking to retrieve what he believe to be non-contraband property seized during the first three searches, including the CZ-26 parts kit, which eventually was returned to Tatman from the sheriff's office.) On October 5, 2006, O'Brien called and asked Tatman to meet him at the Scioto Downs horse racing track in order for them to talk. When Tatman arrived, O'Brien arrested him pursuant to a federal warrant. Tatman then was transported to an ATF field office in Columbus, Ohio.

Once at the ATF office, O'Brien questioned Tatman, focusing on the whereabouts of Parsons, but also raising the possibility that Tatman possessed illegal weapons. The interview included the following exchange:

> AGENT O'BRIEN:    . . . [S]o, there's no other machine guns in your house? Just semi-automatic ones that you got back from (unintelligble) . . .
>
> DANIEL TATMAN:  Yea . . . I got one semi-automatic, that's it.
>
> . . . .

AGENT O'BRIEN:   Alright. Would you have a problem, if I went down to your house, to make sure there is no more machine guns or no evidence of you assisting John Parsons?

DANIEL TATMAN:   My (unintelligible) and parts kits are there, that's it.

AGENT O'BRIEN:   Okay. Alright. But you wouldn't have a problem if we went down there just to take, so I could eliminate you off the . . . (unintelligible)

DANIEL TATMAN:   Uhhh . . . I have no connection on John Parsons.

AGENT O'BRIEN:   No connection?

DANIEL TATMAN:   And I have no machine guns.

AGENT O'BRIEN:   Okay.

DANIEL TATMAN:   Like I said, there is some parts kits there, that . . .

AGENT O'BRIEN:   parts kits a parts kit

DANIEL TATMAN:   Yea.

(Gov't app. 47.) Following this conversation, Tatman signed an ATF "consent to search" form that included the following language: "I understand that any contraband or evidence of a crime found during the search can be seized and used against me in any court of law or other proceeding." (*Id.* at 2.) It further stated that Tatman authorized the federal agents "to conduct a complete search" of his property at 401 Tabernacle Road. (*Id.*) After signing the form, Tatman was transported to Franklin County jail.

O'Brien, along with several other law enforcement officials, then went to Tatman's residence and conducted a search. No assembled machine guns were discovered during this search. However, in Tatman's upstairs closet, O'Brien discovered the "parts kits" that Tatman mentioned during their

discussion. Within the closet, there was a three-foot tall box, adorned with a Ross County Sheriff's Office evidence sticker. The box was open, with a gun barrel sticking out of the top. Some of the gun parts were directly in the box, others were in roughly three or four plastic bags inside the box. In one of the plastic bags were the gun parts that constituted the CZ-26 parts kit.

O'Brien seized the gun parts found in Tatman's closet, but testified that he was not able to determine whether or not they were illegal before doing so. O'Brien stated: "I was not able to identify anything on these firearms. So, we collected these and took photographs of the items that were taken and sent those to our firearms technology branch, where the experts are in identifying machine guns and firearms." (R.E. 39, vol. 2, at 42.) He stated that these experts were the people "that can tell us if a machine gun is illegal or if it's not illegal." (*Id.* at 51.) These firearms experts determined that, among the items seized, the CZ-26 parts kit was considered an illegal machine gun because "it was readily convertible to be made into a machine gun." (*Id.* at 42.) Specifically, Tatman testified:

> Q. You could not, from looking at these parts as they – as you observed them . . . you could not readily ascertain in your own mind that these parts, as you saw them on that day, were machine gun parts, could you?
>
> A. No.
>
> Q. You could not reasonably determine that until after the government examined them carefully and gave you a report?
>
> A. Correct.

(*Id.* at 38-39.) On direct examination from the court, Tatman clarified that he "could not determine whether [the gun parts] were legal or illegal." (*Id.* at 54.)

O'Brien stated that he did not ask Tatman whether he had permission to take the parts kits for voluntary testing, but that he felt he was entitled to seize them based on Tatman's signing of the consent form.[8] O'Brien stated that when he finds an assembled gun that he suspects might be fully automatic he "can do a function test," which does not ensure completely that the weapon is fully automatic, but "gives [him] probable cause." (*Id.* at 74.) In contrast, O'Brien stated that in order to determine whether the parts kits were evidence of a crime he had to "send [them] off to the Firearms Technology Branch to see if it's actually a machine gun." (*Id.* at 76.) O'Brien described his decision-making process in regards to whether he could seize the gun parts as being "contraband" or "evidence of a crime" as follows:

> We determined at that point in time, because it's not a fully assembled firearm, there is no way we can do a function check by pulling the trigger and the receiver back. So, at that time, we make a field judgment to take the evidence to make sure it's not a machine gun, have it tested to determine if, in fact, these parts are a machine gun. And if our tests come back they're not, then the property would be returned.

(*Id.* at 77.) Indeed, O'Brien stated that he "seized [the gun parts] in an investigation to see if they're possibly contraband." (*Id.* at 75.)

We conclude that the CZ-26 parts kit did not fall outside of the scope of Tatman's consent to search. The district court held that because Tatman and O'Brien's conversation about weapons prior to the search focused on additional machine guns, beyond those discovered during the February searches, "a reasonable person would interpret this request to include *only* those weapons and gun

---

[8]O'Brien testified that, during his conversation with Tatman where Tatman consented to the search, he told Tatman that he wanted to make sure that the parts kits were not machine guns. However, this does not appear in the portion of transcript provided from their interview.

parts that had not already been seized during one of the earlier searches." (Dist. Ct. Op. 42.) It is true that "[t]he scope of a search is generally defined by its expressed object." *Jimeno*, 500 U.S. at 251. But this does not mean that, once O'Brien and the other agents were validly in Tatman's house pursuant to his consent, they were not permitted to seize anything other than the specific items O'Brien discussed with Tatman. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.* Tatman signed a consent form permitting the ATF "to conduct a complete search" of his property. (Gov't app. 2.) Moreover, O'Brien specifically told Tatman that he was looking for marijuana, machine guns, and evidence related to John Parsons before Tatman gave his consent to search. There is no indication that these items could not have been found in the cardboard box in Tatman's closet and Tatman did not place any specific limitation on his consent—therefore the federal agents did not exceed the scope of Tatman's consent by searching inside the box. *See Jimeno*, 500 U.S. at 252 (holding that police officer did not exceed scope of consent in searching paper bag found on floor of car where the officer told the suspect he was looking for narcotics and the suspect consented to the search of his car without "any explicit limitation on the scope of the search").

Although we conclude that the federal agents did not exceed the scope of Tatman's consent in conducting the fourth search, this does not mean that the Fourth Amendment permitted the agents to seize the gun parts. The Fourth Amendment "protects two types of expectations, one involving 'searches,' the other 'seizures.'" *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

> The right to security in person and property protected by the Fourth Amendment may be invaded in quite different ways by searches and seizures. A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person or property. The 'plain-view' doctrine is often considered an exception to the general rule that warrantless searches are presumptively unreasonable, but this characterization overlooks the important difference between searches and seizures. If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy. A seizure of the article, however, would obviously invade the owner's possessory interest. If 'plain view' justifies an exception from an otherwise applicable warrant requirement, therefore, it must be an exception that is addressed to the concerns that are implicated by seizures rather than by searches.

*Horton v. California*, 496 U.S. 128, 133 (1990) (citations and footnotes omitted). Tatman's consent permitted the ATF agents to look in the box where they discovered the gun parts and obviated any concerns about the officers interfering with Tatman's expectations of privacy in doing so. However, in order for the gun parts to have been *seized* lawfully, the requirements of the plain view doctrine must be satisfied. *See Soldal v. Cook County, Ill.*, 506 U.S. 56, 65-66 (1992) (noting the applicability of the plain view doctrine to consensual searches); *United States v. Flores*, 193 F. App'x 597, 604-05 (6th Cir. 2006) (finding that a gun found during a consensual search was seized properly because it satisfied the conditions of the plain view doctrine); *United States v. Carter*, 378 F.3d 584, 589-90 (6th Cir. 2004) (en banc) (applying plain view doctrine to consensual search). Under this doctrine, law enforcement officers are permitted to seize evidence without a warrant if the evidence is "'(1) in plain view; (2) of a character that is immediately incriminating; (3) viewed by an officer lawfully located in a place from where the object can be seen; and (4) seized by an officer who had a lawful right of access.'" *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 549 (6th Cir. 2003) (citing *United States v. Roark*, 36 F.3d 14, 18 (6th Cir. 1994)).

The seizure of the gun parts, including the CZ-26 parts kit, violated Tatman's Fourth Amendment rights because they were not immediately incriminating. *See United States v. McLevain*, 310 F.3d 434, 442 (6th Cir. 2002) ("The plain view exception authorizes seizure of only those items that immediately appear to be contraband." (internal quotation marks and brackets omitted)). Under the plain view doctrine, an item seized cannot satisfy the immediately incriminating requirement unless the officer who discovers and seizes the item has probable cause to associate the item with criminal activity. *Arizona v. Hicks*, 480 U.S. 321, 326-27 (1987); *see also Soldal*, 506 U.S. at 69 ("[T]he plain-view cases clearly state that, notwithstanding the absence of any interference with privacy, seizures of effects that are not authorized by a warrant are reasonable only because there is probable cause to associate the property with criminal activity. . . . [S]uch seizures must satisfy the Fourth Amendment and will be deemed reasonable only if the item's incriminating character is 'immediately apparent' . . . ."). "[T]he Supreme Court does not require that officers *know* that evidence is contraband. Instead, 'probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband . . . .'" *McLevain*, 310 F.3d at 441 (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)). This Court has held that "when an item appears suspicious to an officer but further investigation is required to establish probable cause as to its association with criminal activity, the item is not immediately incriminating." *Id.* at 443 (internal quotation marks omitted); *see also Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) ("If . . . the police lack probable cause to believe that an object in plain view is contraband without conducting some further

search of the object—*i.e.*, if its incriminating character is not immediately apparent—the plain-view

doctrine cannot justify its seizure." (citations, internal quotation marks, and brackets omitted)).

As the district court correctly concluded, "[t]he trigger group was not readily identifiable as

a machine gun. Only after Agent O'Brien sent photographs of the gun parts to the firearms

technology branch did the experts determine the trigger group was capable of being converted into

a machine gun." (Dist. Ct. Op. 39.) O'Brien testified that he could not tell whether the gun parts

he found in the box were legal or illegal and, because they were not assembled, he could not conduct

a function test which he normally would use to determine whether there was probable cause to

believe a gun was fully automatic.[9] Indeed, he seized a whole box of gun parts from Tatman's closet

and the ATF experts determined that, in their judgment, only one set of parts was illegal. While

O'Brien clearly suspected that some of the gun parts might have been contraband, they were not

immediately incriminating because they required further investigation to determine whether or not

they were illegal. *McLevain*, 310 F.3d at 443. Here, in order for the Government to come to the

conclusion that the CZ-26 parts kit was illegal, the evidence had to be shipped to firearms experts

who then reconstructed the parts into a fully automatic weapon. In *United States v. Szymkowiak*, 727

F.2d 95 (6th Cir. 1984), this Court determined that the seizure of weapons did not qualify under the

plain view doctrine—and therefore was unlawful—when a firearms expert brought to the scene

---

[9]Consistently, the officers at the Ross County Sheriff's Office apparently did not think that the CZ-26 parts kit was illegal because they returned it to Tatman after they initially seized it during one of the February searches. It seems that Tatman also thought that the parts were legal as he specifically mentioned to O'Brien that the parts kits were in his house before granting O'Brien consent to search.

"could not clearly determine without disassembling the firearms whether they had been illegally

adapted for fully automatic performance." *Id.* at 96. We concluded that, under those circumstances,

the incriminating nature of the weapons was not "apparent" and was certainly not "immediately

apparent." *Id.* at 99; *see also United States v. Beal*, 810 F.2d 574, 577 (6th Cir. 1987) (drawing on

*Szymkowiak* to find that seizure of pen guns did not satisfy the "immediately apparent" requirement

of plain view doctrine).[10]

Although O'Brien admitted to never asking Tatman for consent to take the gun parts for

testing, he apparently was under the impression that Tatman's signing of the form meant that "[he]

could take any property." (R.E. 39, vol. 2, at 75.) He was mistaken. The consent form simply stated

that Tatman "underst[ood] that any contraband or evidence of a crime found during the search can

be seized." (Gov't app. 2.) Because the gun parts seized were not immediately incriminating, the

---

[10]In *Szymkowiak*, this Court described the significance of this requirement:

> The requirement that probable cause be "immediate" from the discovery of the object
> specifically averts the "danger inherent in such a situation that officers will enlarge
> a specific authorization, furnished by a warrant or an exigency, into the equivalent
> of a general warrant to rummage and seize at will." . . . . In considering whether
> probable cause was "apparent" to the executing officers, a reviewing court should be
> duly mindful of the executing officers' particular subjective training and experiences.
> Where an executing officer's probable cause to connect the viewed item with
> criminal behavior is not *both* "immediate" and "apparent," however, the individual's
> interests in retaining possession of property and in maintaining privacy, and society's
> interest in lawful enforcement activity, are greatly compromised.

*Szymkowiak*, 727 F.2d at 98 (citations omitted) (quoting *Texas v. Brown*, 460 U.S. 730, 748 (1983)
(Stevens, J., concurring)).

ATF agents did not have probable cause to believe they were contraband or evidence of a crime. Thus, their seizure is not covered by the plain view doctrine.

The dissent argues that the seizure of the gun parts was justified because of the consent form's reference to seizures. However, the seizure language included in the consent form tracks precisely the language governing seizures made pursuant to the plain view doctrine. *See Arizona v. Hicks*, 480 U.S. 321, 323 (1987) (holding that in order to seize property under the plain view doctrine, police must have "probable cause to believe that the item in question is *evidence of a crime or is contraband*" (emphasis added)); *Texas v. Brown*, 460 U.S. 730, 741-42 (1983) (interpreting "the 'immediately apparent' language of *Coolidge*" as requiring probable cause to seize "contraband or evidence of a crime"). Tatman's consent to seize items the agents already were permitted to seize under the plain view doctrine does not change our calculus. *See Hicks*, 480 U.S. at 327 ("Dispensing with the need for a warrant is worlds apart from permitting a lesser standard of *cause* for the seizure than a warrant would require, *i.e.*, the standard of probable cause."). We conclude that neither the seizure of the gun parts nor O'Brien's interpretation of what the consent form permitted him to seize was reasonable.

The Government has provided no alternative justification for seizing these gun parts without a warrant.[11]  Therefore, the seizure of those items, including the CZ-26 parts kit, violated the Fourth Amendment, and the district court was correct to suppress them.

### III.  CONCLUSION

Based on the foregoing analysis, we **AFFIRM** the district court's ruling granting Tatman's motion to suppress.

---

[11]For example, had the weapons not been fully dissembled and had Tatman been in the house, exigent circumstances may have justified their seizure, at least temporarily. *See Flores*, 193 F. App'x at 604-05 (concluding that even if the gun's seizure were not covered by the plain view doctrine, the officers could seize the weapon temporarily out of safety concerns because they were looking for a murder suspect, the search had not yet been completed, and there was a four-year-old child in the house).

**CORNELIA G. KENNEDY, Circuit Judge, concurring in part and dissenting in part**.

I concur with much that the majority has said, and agree that much of the government's evidence was obtained in violation of the Fourth Amendment and must be suppressed. However, I disagree with the majority's analysis on two points. First, I believe that exigent circumstances existed on the night of February 4 that allowed Deputy Clark to advance into the house and enter the upstairs bedroom where Tatman was located because Tatman had been violent earlier in the evening and the officer received credible information that Tatman had access to illegal, fully automatic weapons. Second, I believe that Tatman consented to the seizure of items during the October search conducted several months later even when the plain view doctrine would not allow seizure. Thus, I respectfully dissent on these two points.

On the first point, I would find that exigent circumstances existed on February 4 that allowed Clark to proceed to the upstairs bedroom where Tatman was dressing. "[A]lthough 'searches and seizures inside a home without a warrant are presumptively unreasonable,' *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (internal quotation marks omitted), that presumption can be overcome." *Michigan v. Fisher*, 130 S. Ct. 546, 548 (2009). I agree with the majority that the officer was permitted to enter the home on Mrs. Tatman's consent, until the point that Tatman objected. At that point, he could go no further without a warrant, unless he had exigent circumstances allowing him to proceed deeper into the house. I disagree with the majority that there were no exigent circumstances here. "The presence of a weapon creates an exigent circumstance, provided the government is able to prove they possessed information that the suspect was armed and likely to use a weapon or become violent." *United States v. Bates*, 84 F.3d 790, 796 (6th Cir. 1996); *see also*

*Warden v. Hayden*, 387 U.S. 294 (1967). Here, the officer had come across considerable evidence – including visible physical injuries to Tatman's wife – that Tatman had been violent just a few hours prior. When questioned about this, Tatman did not deny his behavior, and the officer had both the intention and the probable cause to arrest Tatman. Tatman agreed to leave with the officer, saying "If I need to go, I'll go." Because Tatman had been roused from his sleep and was not fully dressed, he asked for and received permission from Clark to go upstairs to his bedroom to put on different clothing. The other officer accompanying Clark had left the area by this time. Significantly, while Clark waited, he received information from Mrs. Tatman that Tatman had access to fully automatic weapons. These were not ordinary firearms, but illegal weapons that Congress "believed . . . by their very nature, were extremely dangerous and served virtually no purpose other than furtherance of illegal activity." *United States v. Dunlap*, 209 F.3d 472, 478 n.12 (6th Cir. 2000) (quoting *United States v. McKelvey*, 7 F.3d 236, 1993 WL 339704, at *6 (6th Cir. Sept. 1, 1993) (per curiam)), *abrogation on other grounds recognized by United States v. Camacho-Arellano*, --- F.3d ----, 2010 WL 2869394, at *6 (6th Cir. Jul 16, 2010). In my view, the combination of all circumstances, including the recent violence by Tatman plus his access to an illegal and peculiarly dangerous weapon, created exigent circumstances justifying the officer's entry further into the household. For that reason, I would reverse the district court and hold that the fully automatic firearm the officer saw in plain view in the bedroom at that time should not be suppressed.

However, once Tatman had been secured and removed from the house, and the illegal firearm removed, the exigent circumstances rule ends. *Cf. United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994). And I agree with the majority that Mrs. Tatman's subsequent consent to search was not

valid, and the officers had no other right to perform a warrantless search. Thus, I agree that any evidence found on February 4 after the defendant was secured and out of the house should be suppressed. I also agree with the majority that the search warrant issued two days later was invalid, and any evidence obtained under it must also be suppressed.

However, I part ways with the majority once more. I believe that the district court erred when it suppressed evidence obtained during the October search, which was conducted pursuant to Tatman's explicit and written consent. The majority notes that a consent to search is not a consent to seize, thereby requiring that seizing officers satisfy the Fourth Amendment in some other way, say, by invoking the plain view doctrine. I agree that this is the rule, "unless of course the consent goes so far." 4 W. LaFave, Search and Seizure § 8.1(c), p. 36 (4th ed. 2004).

Here, the consent goes so far as to allow a seizure. Tatman did not just consent to a search, but he also explicitly authorized that "any contraband or evidence of a crime found during a search *can be seized* and used against me in any court of law or other proceeding." The scope of this consent should be interpreted according to "what . . . the typical reasonable person [would] have understood" the consent to include. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). I am not persuaded that "the typical reasonable person" would interpret Tatman's consent form to authorize seizure of "contraband or evidence of a crime" only when the Fourth Amendment already allowed seizure under the plain view doctrine. I think the better interpretation is that Tatman consented to the seizure of items when it was reasonable to do so: that is, when there was a reasonable basis for believing that an item discovered is "contraband or evidence of a crime." Because there was a reasonable basis for believing that the parts kit was "contraband or evidence of a crime," the officers

acted within the bounds of Tatman's voluntary consent – and therefore the Fourth Amendment – when they seized it.

Accordingly, I would affirm in part and reverse in part the district court's suppression of evidence. I would allow the admission of (1) evidence relating to the fully automatic weapon seen in plain view in Tatman's bedroom on the night of February 4 and (2) evidence seized during the October search pursuant to Tatman's consent. Because the majority affirms the district court's suppression of this evidence, I respectfully dissent in part.